CHARLES RUBENSTEIN, INC., a corporation, and Rubenstein & Kaplan, a partnership of Abraham A. Kaplan, Charles Rubenstein, Anna Rubenstein, and Charles Rubenstein and Anna Rubenstein as Trustees for Arnold Rubenstein and Sheldon Rubenstein, d/b/a Hollywood Theatre, Plaintiffs,

v.

COLUMBIA PICTURES CORPORATION, a corporation, Loew's Incorporated, a corporation, Minnesota Amusement Company, a corporation, Paramount Film Distributing Corporation, a corporation, RKO Radio Pictures, Inc., a corporation, Twentieth Century-Fox Film Corporation, a corporation, United Artists Corporation, a corporation, Universal Film Exchanges, Inc., a corporation, Warner Bros. Pictures Distributing Corporation, a corporation, Defendants.

Civ. A. No. 4332.

United States District Court
D. Minnesota,
Fourth Division.
Jan. 27, 1959.

See also 154 F.Supp. 216.

Lee Loevinger, Louise A. Herou, and Larson, Loevinger, Lindquist, Freeman & Fraser, Minneapolis, Minn., for plaintiffs.

Mandt Torrison, James C. O'Neill, and Bundlie, Kelley & Maun, St. Paul, Minn., for defendants Paramount Film Distributing Corporation and Minnesota Amusement Co.

Philip Neville and Neville, Johnson & Thompson, Minneapolis, Minn., for remaining defendants.

NORDBYE, Chief Judge.

Charles Rubenstein, Inc., is the owner of the Hollywood Theatre, hereafter called Hollywood. When it commenced operations on October 26, 1935, it was a newly constructed, attractive motion picture theatre situated in a suburban area of Minneapolis with a seating capacity of 950. Charles Rubenstein was President of the corporation. The principal shareholders at the time Hollywood was built were Louis Rubenstein, father of Charles, and A. A. Kaplan. Louis Rubenstein held 208 shares; A. A. Kaplan, 260 shares; Charles Rubenstein, 50 shares; and Anna, wife of Louis, 2 shares. Louis Rubenstein and A. A. Kaplan also were in business as a partnership under the name of Rubenstein and Kaplan and owned a theatre building known as the Arion, which was situated on a busy commercial street in northeast Minneapolis about one mile from the location of the Hollywood. Rubenstein and Kaplan, at the time the Hollywood was built, had leased the Arion Theatre to the Minnesota Amusement Company, hereafter referred to as MAC, the largest operator of motion picture theatres in Minneapolis and throughout the State and in some of the neighboring States. It was a wholly owned subsidiary of Paramount Pictures, Inc., one of the largest distributors of motion pictures. Its theatres were commonly referred to as the circuit theatres or Publix theatres. The other defendants are the principal distributors of motion picture films in the United States. The jurisdiction of this Court is not in issue.

In 1935, before the Hollywood opened, the Arion was a 932 seat theatre charging 15 cents admission and on a playing position of 112 days after first run. Shortly before Hollywood opened, Arion advanced its admission price to 20 cents and changed its playing position to 70 days after first run. When Hollywood opened on a 25 cent admission, it obtained a 56 day playing position after first run. MAC, as the lessee of Arion in 1935, had permitted that theatre to become run down and in need of improvements. It was in poor shape to compete with the brand new and attractive Hollywood.

These two theatres were in substantial competition with each other, and it is evident that MAC recognized the inroads which Hollywood would make on the business of Arion. At first it proposed to Rubenstein and Kaplan, the lessors of Arion and the principal stockholders of Hollywood, that the two theatres should form a pool whereby the two theatres would be operated jointly and the net profits divided equally between them. This proposal was set forth and recorded in a memorandum by MAC in the following language:

"Film is to be bought for these houses on the same basis, or approximately the same basis, as is now done for the Uptown and Granada [two theatres operated by MAC],—namely, giving the Hollywood the first choice of pictures, and playing the repeat runs on the big pictures, and also the sluff pictures, at the Arion. This would give the Hollywood every break and definitely classify the Arion as a cheaper type house."

Rubenstein and Kaplan demurred to this plan, and suggested that the business of the Arion was being jeopardized by the failure of the lessees to keep the theatre in proper repair which MAC was required to do under the lease. When the proposed pooling arrangement was not consummated, MAC expended in September, 1936, some $16,000 on Arion for improvements. Arion then went on a 25 cent admission price and announced to the distributors that it would be on a 49 day playing position, 7 days ahead of Hollywood. The letter of August 28, 1936, from MAC to the branch manager of Metro Goldwyn Mayer illustrates the summary manner in which the changed policy of the Arion was announced. It reads:

"Mr. W. H. Workman
Metro Goldwyn Mayer
Minneapolis, Minn.

"Dear Mr. Workman:

"Please be advised that the Arion Theatre, Minneapolis, will close after the last performance Sunday night, Septem-

ber 13, 1936. We will advise you as soon as possible the definite reopening date.

"For your information, the admission price at the Arion Theatre after reopening will be 25¢. We will therefore play pictures according to the 25¢ schedule of all our theatres—49 days after first run—giving this theatre seven days protection over other theatres listed in the clearance charging the same admission.

"Yours very truly,

(Signed)    J. A. Branton"

At this time there was nothing startling about the rather casual manner in which this announcement of policy was made to the distributors. For some years MAC's suburban theatres charging 25 cents admission were the only theatres in Minneapolis receiving a 49 day availability after first run. Preferential runs long had been accorded to MAC theatres by the distributors, and when requested it was taken for granted that it would be fulfilled. In view of all the circumstances, to suggest that the preferential run accorded Arion was brought about by independent negotiations by MAC with each of the distributors seems highly improbable. Reference may be made to the clearance pattern in Minneapolis as noted by the manager of Metro Goldwyn Mayer to his home office in August, 1936. This is the schedule that all of the distributors followed:

| "25 cent houses | 49 days | Publix [MAC Circuit Theatres] |
| 25 cent houses | 56 days | Independents |
| 20 cent houses | 63 days | Publix |
| 20 cent houses | 70 days | Independents |
| 15 cent houses | 105 days | Publix |
| 15 cent houses | 112 days | Independents" |

---

It is not claimed that any of the distributor defendants offered or even considered a request for a better run for Hollywood during the period in controversy. All of them, though not all at the same time, followed the pattern of preference to MAC theatres. The language in the following cases is apposite here:

In Federal Trade Comm'n v. Cement Institute, 333 U.S. 683, note 17 at page 716, 68 S.Ct. 793, at page 811, 92 L.Ed. 1010, the Supreme Court stated,

"It is enough to warrant a finding of a 'combination' within the meaning of the Sherman Act, if there is evidence that persons, with knowledge that concerted action was contemplated and invited, give adherence to and then participate in a scheme."

Also, in United States v. Paramount Pictures, 334 U.S. 131, 142, 68 S.Ct. 915, 922, 92 L.Ed. 1260, will be found the following:

" * * * It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement."

There is conflict in the testimony as to whether Hollywood made any objection to the preferential run accorded Arion in September, 1936. But there is substantial and credible evidence that protests were made by Hollywood's booking agent, Charles Rubenstein, to many of the distributors, and there is every reason to believe that vigorous objections were made. For a year Hollywood had been on a 56 day availability as a 25 cent house and, without any forewarning, Arion announced after some improvements to the theatre that it would change its policy from a 20 cent house to a 25 cent house and operate on an availability of 7 days ahead of Hollywood. Certainly, Hollywood was a theatre superior in appointments and attractiveness as com-

pared to Arion. Arion was built in 1913. Hollywood was built in 1935, and generally was considered one of the most attractive suburban theatres at that time in Minneapolis. The only advantage that Arion had may be attributed to its location on a commercial street where residents in the area would go to shop and look for entertainment. But the evidence is wanting to support any contention that Arion was entitled to a preferential run over Hollywood. Admittedly, the unusual situation exists of the principal stockholders in Hollywood being the lessors of Arion to MAC. The Arion lease did not expire until 1943, and it is quite evident that MAC wanted to retain Arion as one of its suburban theatres in that particular locality. Louis Rubenstein died in 1939, so we do not have the benefit of his testimony. His interest, after his death, in the Rubenstein and Kaplan partnership inured to his widow, Anna Rubenstein. A. A. Kaplan was not active in the booking of films for Hollywood. Charles Rubenstein, the son of Louis, was a young man of 23 years of age in 1936, but he was in active charge as manager of Hollywood. He testified that he repeatedly protested to the branch managers of most of the distributors as to the preferential run granted Arion and requested that Hollywood be accorded the same availability as Arion. All of the circumstances would indicate that such protestations were made, at least to some of the distributors. Warner Bros. points out that the record is silent as to any specific request by Hollywood directed to it for an availability equal to that of Arion. But the failure of any demand by Hollywood to the defendant Warner Bros. to cease the illegal practice of granting a MAC circuit theatre a preferential run cannot release this defendant from liability for any unlawful acts or legalize such practices. Congress Building Corp. v. Loew's, Inc., 7 Cir., 246 F.2d 587, 595. Hollywood was placed in the same slot as other independent 25 cent houses competing with MAC theatres. Indeed, it would have been quite futile to have made any demand for a better run.

It is vigorously urged, however, that Hollywood consented to or acquiesced in the arrangement in that the two principal stockholders of Hollywood were the lessors of the Arion. Hence, it is reasoned that a successful operation of Arion by MAC was to the interest of Louis Rubenstein and Kaplan, and they were quite content to operate the Hollywood on a 56 day run. But that reasoning is not bottomed upon any affirmative evidence, nor is it persuasive. The lease returns on the Arion were in no way contingent upon the earnings of the theatre. As stated, the lease did not expire until 1943. MAC was a solvent lessee. It is true that the record does not disclose any written protest to the distributors or MAC by Hollywood as to its run. However, the bald facts are that Hollywood had been operating on an availability ahead of Arion for almost a year and its gross returns exceeded that of Arion, and then upon Arion's being accorded a preferential run, Arion's gross receipts began to exceed Hollywood's. Charles Rubenstein, though young, had been connected with the operation of motion picture theatres for some years. The impact of the favored run to Arion upon Hollywood's gross receipts was noticed by him immediately, and there is every reason to believe that protests were made. Not only was he aware of what was happening to Hollywood's receipts, but the distributors were aware of the situation as well. This is apparent from a letter written by the branch manager of Metro Goldwyn Mayer as early as November 17, 1936, which stated,

"Since the Arion started to play ahead of the Hollywood, the Hollywood has been going substantially backward as could quite naturally be expected in the same manner as the new Arion last year went back when Hollywood was playing our product ahead of them."

The evidence is entirely wanting in any support of defendants' contention that Hollywood was content with the situation because of its relationship with MAC. In any event, under the circumstances

here, mere silence on Hollywood's part could not immunize the defendants from any wrong which proximately resulted from their illegal actions.

■ That there had existed in Minneapolis for some time prior to 1936 a local system of runs and clearances dominated by MAC due to its economic power is so strongly established by the evidence that any lengthy discussion of the situation seems wholly unnecessary. The various license agreements between the MAC theatres and the distributors reflect the preferential runs granted the circuit theatres. The entrenched preferential runs of MAC theatres existed with the approval and cooperation of all the defendant distributors doing business in this State at the time. It is idle to suggest that the distributors negotiated independently with MAC for the preferred run granted to Arion over Hollywood, or that Arion was granted that run because it agreed to pay the distributors a higher film rental than Hollywood. The arrangement made in 1936 with reference to Arion's run over Hollywood was a mere consummation of the standing arrangement between MAC and the distributors; that is, when there were two theatres in substantial competition operating at the same admission price, one an independent theatre and the other a circuit theatre operated by MAC, the latter upon request of the distributors received the preferential run. There can be no real question that this tacit arrangement between MAC and the distributors was in violation of the anti-trust laws of the United States. That these defendant distributors controlled the distribution of motion pictures in interstate commerce in the United States is admitted. Hollywood was denied a free market in which to deal to its detriment and to the benefit of Arion. The door was closed to it by the concerted action of the motion picture distributors and MAC, and it could not compete with Arion free from the unreasonable runs and clearances designed and followed by the distributors and MAC. The language of this Court in Homewood Theatre, Inc.

v. Loew's, Inc., D.C., 110 F.Supp. 398, 407, is appropriate here:

"An impartial consideration of the record here not only amply justifies, but requires, a finding that the defendants acted in concert in the establishment of a uniform system of runs and clearances in the licensing of motion pictures to the various motion picture houses in the City of Minneapolis, and one of the purposes of the establishment of uniformity and the acting in concert in the formation of a system of runs and clearances was to grant the local M.A.C. theatres a preferred position in runs and clearances. Such action presumably was prompted by the fact that the M.A.C. was the largest circuit exhibitor of motion pictures in this area and thus the source of a large revenue to the distributors."

Under no reasonable construction of the evidence can it be held that the clearance of the Arion over the Hollywood was reasonable. No attempt was made by the distributors to afford Hollywood an opportunity to meet Arion's percentage rental terms. And here we are not required to base the finding of a conspiracy on mere parallelism of action on the part of the distributors in dealing with Arion. Hollywood possessed at least an equal potential for theatre patronage to insure the distributors a rental percentage-wise on boxoffice returns comparable to that of Arion's, but it was afforded no opportunity by the distributors to compete with Arion in a free market.

■ The Court is not unmindful that distributors, acting separately, could determine, without infraction of the anti-trust laws, that where two theatres are in substantial competition, circumstances may well justify the granting of a preferential run to one of them. Moreover, it is well recognized among distributors, as well as exhibitors, that where several distributors have placed a certain theatre on a particular availability, other distributors generally follow the same plan be-

·cause the particular theatre, in order to operate successfully, should have an even flow of pictures on the same availability. But the Arion-Hollywood situation as to runs and clearances did not arise on account of such circumstances. Here, a ·clear discrimination as to Hollywood existed merely because Arion was a circuit theatre and Hollywood an independent theatre.

■ Defendants assert that plaintiffs' subsequent conduct after 1936 lends support to their position that Hollywood became more interested in obtaining lower film rental for its theatre and a renewed lease on the Arion than in objecting to its assigned run or demanding any redress for any claimed wrong by reason of the preferential run granted to Arion. This position requires a short recital of the events which took place after 1936. As stated, Louis Rubenstein died in 1939. His widow succeeded to his interest as a lessor of Arion. Apparently Kaplan was then the dominating partner in the partnership. Charles Rubenstein went into the military service in September, 1942, and remained there until April, 1946. During that period, one Martin Lebedoff was in charge of the booking and buying of film for Hollywood. However, the partnership, Rubenstein and Kaplan, from 1943 on, operated the Hollywood. In 1942, MAC began to negotiate for a ten-year renewal of its lease on Arion, which lease expired in 1943. The partnership of Rubenstein and Kaplan also owned the Granada Theatre in Minneapolis, which theatre was likewise leased to MAC. MAC contends that it was sustaining a net loss in the operation of both the Arion and the Granada. Moreover, MAC asserts that the partnership was making a fair return from its investment on the leases of the Arion and the Granada theatres. That the partnership was making a profit on the leases of these two theatres is not denied. On the other hand, MAC apparently wanted to renew the leases on both theatres. Satisfactory rental terms were agreed upon and the Arion lease was continued for ten years at $12,000 per year. In the rental negotiations in 1942, Charles Rubenstein represented his mother and there is no contention that the lessors attempted in any way to impose any restrictions or conditions in the Arion lease upon the playing position of the Arion with respect to Hollywood. Defendants urge with great earnestness that, if the plaintiffs were dissatisfied with the Arion's preferential runs, some demand or covenant in the Arion lease would have been inserted requiring MAC to cease its illegal activities in that regard and that the lessors' failure to do so indicates that they recognized that they were the beneficiaries of the preferential run granted Arion in that Arion's prosperity benefited them. They assert, therefore, that Hollywood, by strong inference, was entirely satisfied with the situation with respect to the allotted runs accorded to these two theatres. In other words, defendants assert that plaintiffs clearly have assented to any injury which may have resulted to Hollywood by reason of Arion's preferential run.

But defendants' position in this regard cannot be sustained after a fair consideration of all the circumstances. The prior rent on the Arion had been $15,000 per annum. The renewed rent in 1943 was $12,000. MAC does not contend that anything was said or done by plaintiffs which led it to believe that Hollywood was satisfied with its run or that MAC relied on anything that took place during the negotiations for the renewal of the lease which could constitute an estoppel. MAC received no specific encouragement from the plaintiffs that Hollywood was satisfied with its run, nor was it lulled into any understanding that its past wrongdoings were forgiven. Of course, the partnership of Rubenstein and Kaplan was not the owner of Hollywood. Its operation of Hollywood under a lease after the Arion lease was renewed for ten years was brought about primarily by reason of Charles Rubenstein's entering into the military service. The evidence here will not permit a finding that the agreement to lease Arion to MAC, without more, constitutes an acquiescence

to use that theatre in discrimination against another theatre in which the lessors as stockholders had a controlling interest. The upshot of the matter is that the futility of further protest against the economic power of MAC in the control of runs and clearances in Minneapolis was apparent to all the exhibitors during the period in question, and it was not until the national conspiracy as disclosed in the Paramount cases had ended by final decrees that any hope of redress for the independent exhibitors became apparent. If the only evidence of discrimination against independent theatres in Minneapolis was this isolated instance of the preferential run accorded to Arion, then one might be tempted to infer that it arose from the relationship between the lessors of Arion and the operators of Arion. However, in that Arion's run over Hollywood was merely a following of the pattern set as to preferences granted to the circuit theatres, no such inference is warranted.

That Hollywood sustained damage by reason of Arion's preferred run is unmistakably clear. However, the arrival at a fair standard of damages is fraught with many vexatious problems. At the outset, it should be stated that every informed person in the motion picture industry recognizes that, as between two theatres in substantial competition, the earlier playing position is highly desirable. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652. The following account of the gross earnings throughout the immediate years before and after Arion had the preferred run is the most persuasive testimony in that regard:

|                      | Hollywood | Arion     |
|----------------------|-----------|-----------|
| 1935  (after 10–26)  | $11,274   | $ 7,948   |
| 1936  (to 9–5)       | 39,396    | 28,632    |
| 1936  (after 9–5)    | 18,522    | 19,031    |
| 1937                 | 48,241    | 59,580    |

And this comparable disparity of gross earnings between the two theatres continued as long as Arion had the preferred run. Plaintiffs must recognize that the situation would not justify the favoring of Hollywood with a preferential run as long as the two houses were charging the same admission price. In fact, all that Hollywood ever demanded was a day and date run with Arion; that is, equal availability. Most exhibitors, as well as distributors, consider that a day and date run for two competing theatres is not economically sound because obviously the potential drawing patronage of the two theatres simply would be divided between the two and each would suffer a depletion of earnings. On the other hand, equal availability does not necessarily mean a day and date exhibition of the same picture. Self interest of the theatres involved would prompt them to arrange their bookings so that day and date exhibition would not occur too frequently. No doubt, therefore, some plan of booking as between the two theatres as to certain pictures released would or could be arranged in order to avoid day and date exhibitions. Hollywood takes the position that if it had been accorded a 49 day availability, as well as the Arion, the latter would not have been able to compete with the former for a playing position, and Hollywood would have continuously played ahead of the Arion as it did for the first ten and one-half months of its operation. But there is no sound basis for that assertion. During the first ten and one-half months of Hollywood's operation, Arion was in a rundown condition operating as a 15 cent and then a 20 cent house on a substantially later availability than Hollywood. Moreover, Hollywood's novelty as a new theatre would attract patronage during its early operations which would not necessarily indicate a basis for the subsequent patronage of the theatre. Arion did have

the advantage of being on one of the main commercial streets of the City leading into the loop, with heavy vehicular traffic and pedestrian congregation. Hollywood was a neighborhood theatre situated in a residential area.

In addition, however, plaintiffs emphasize that a group of pictures either played day and date with Arion or ahead of Arion during the period in question, and they attempt by a comparison of box-office grosses to establish Hollywood's greater drawing power as a theatre. But there are many factors which militate against plaintiffs' conclusion that these 30 pictures scattered in showings over a period of twelve years demonstrate the superiority of Hollywood over Arion in producing boxoffice grosses. Some of the pictures played at Hollywood before Arion. At other times on Saturday nights Hollywood was playing double features and its receipts include the entire Saturday night receipts, while the Arion receipts are limited to the particular pictures in question and do not include the entire receipts for the particular Saturday nights in question. During some of the years (October, 1940, to January 6, 1943), Hollywood was charging a less admission price than Arion when the same pictures were played at both theatres day and date. Obviously, when two neighborhood theatres in substantial competition are playing the same pictures day and date, the theatre playing at a less admission price may garner the higher boxoffice grosses.

Plaintiffs assert that on a 49 day availability Hollywood would have grossed 125 per cent of Arion's actual grosses during the periods when Hollywood was playing behind Arion. This prediction is based largely upon the experience of the two theatres from October, 1935, to September, 1936, and in the year 1952 (a period after the impact of the conspiracy). It is apparent that the comparison of the earnings of the two theatres from October, 1935, to September, 1936, affords no basis for the computation of damages. This was the period before Arion's improvements. It was operating on a 112 and 70

day availability, and Hollywood was the newly constructed theatre on a 56 day availability. During 1952 Arion was operating on a 42 day availability for a portion of the year and Hollywood was playing on an availability of 28 days for some 6 months. Moreover, it is evident that the selection of that year for a comparison of grosses of these two theatres, some four years after the conspiracy had ended, is not a persuasive or safe guide for the determination of damages. Many changes had taken place in the Minneapolis motion picture theatre situation since 1948. The heavy competitive impact of television was present. Suburban areas were growing by leaps and bounds. Take the year 1951, for instance. Arion was operating on a 28 day availability, and Hollywood, except for a period from March 7 to July 18, 1951, when it was on a 35 day availability, was playing on a 56 day availability. Nevertheless, the difference in the boxoffice gross for that year was about $1,000 in favor of Arion. If we should use the year 1951 as a guide in assessing damages, the losses to Hollywood by reason of Arion's preferred run would appear to be very moderate.

The question of damages requires a consideration of the Paramount decrees, the statute of limitations, the divisibility of any judgment of damages to be entered herein and which of the defendants named were a part of, and are liable for, the conspiracy which existed. The complaint in this action was filed November 6, 1952. At that time the Clayton Act contained the following provision:

> "Whenever any suit or proceeding in equity or criminal prosecution is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, the running of the statute of limitations in respect of each and every private right of action arising under said laws and based in whole or in part on any matter complained of in said suit or proceeding shall be suspended during the pendency thereof." 15 U.S.C.A. § 16.

■■ The Court has admitted in evidence the so-called Paramount decrees. The positions of the courts as to the national conspiracy are to be found in United States v. Paramount Pictures, D. C., 66 F.Supp. 323; 70 F.Supp. 53; 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; 85 F.Supp. 881; United States v. Loew's Inc., 339 U.S. 974, 70 S.Ct. 1032, 94 L. Ed. 1380. The Court is of the opinion that the Paramount decrees are admissible and have evidentiary value herein. The so-called national conspiracy had as one of its objectives the granting of preferential runs to the exhibitors affiliated with the major distributors. This was carried out on a local level with reference to the preferential runs granted to MAC, a wholly owned subsidiary of Paramount Pictures, Inc. The government action in the Paramount case was instituted on July 20, 1938, and terminated in 1948, 1949 and 1950, the dates being different as to the several defendants therein. The earliest termination of the government suit as to any one of the defendants was on November 8, 1948, as to RKO.

The preferential run was granted to Arion in September, 1936. From that date until the government suit was instituted on July 20, 1938, about one year and ten months had elapsed. From November 8, 1948, when the RKO decree was entered until the filing of the present action on November 6, 1952, approximately four years elapsed. In view, therefore, of the tolling of the statute of limitations by 15 U.S.C.A. § 16, it follows that plaintiffs may recover whatever damages Hollywood sustained from September 6, 1936, to the end of the conspiracy. However, this Court in Charles Rubenstein, Inc. v. Columbia Pictures Corp., D.C., 154 F.Supp. 216, has determined that as to MAC, plaintiffs can recover damages only for the six-year period prior to November 6, 1952. This is bottomed primarily on the premise that MAC was not a party to the government suit, and hence the statute of limitations was not tolled as to it. Defendants contend that the Court cannot apportion damages among tort feasors, but must hold that all defendants are jointly and severally liable for the damages which plaintiffs have sustained. But the six-year statute of limitations is personal to MAC; it is not applicable to the remaining defendants. There is no good reason why damages may not be assessed against the various defendants in the amounts and according to the liabilities established. See Rule 20(a), Federal Rules of Civil Procedure, 28 U.S.C.A., and Electric Theater Co. v. Twentieth Century-Fox Film Corp., D.C., 113 F.Supp. 937.

Before arriving at the method of computing damages herein, certain motions made by individual defendants should be determined. First, Warner Bros. seek a dismissal because the evidence does not affirmatively establish that Hollywood ever made a demand upon it for a better run during the period in question. However, it is clear that Warner Bros., a member of the national conspiracy, also was a member of the conspiracy on the local level which had for its objective the granting to MAC theatres a preferential run over the independent theatres charging the same admission price. In view of the clarity of the evidence in that regard and the apparent futility of any demand on the part of independent theatres to terminate that concert of action, Warner Bros. cannot be immunized from its wrongdoing merely because Hollywood did not demand that it withdraw from the illegal combination.

■ The next motion, however, made by the Paramount Film Distributing Corporation (hereafter called Paramount Film) for judgment in its behalf because it is not a proper defendant, requires a somewhat extended discussion. Paramount Film was incorporated in 1939. It was the wholly owned subsidiary of Paramount Pictures, Inc. It was licensed by its parent corporation to distribute Paramount products from branch offices where Paramount Pictures, Inc., did not itself distribute its pictures. Paramount Pictures, Inc., distributed its own pictures in the State of Minnesota during the years in question and did so

until it was dissolved on or about December 31, 1949, in accordance with the directive of a consent decree in United States v. Paramount, supra. Paramount Film distributed the pictures of Paramount Pictures in certain States other than Minnesota up to January 1, 1950. Paramount Pictures, Inc., under the directive for its dissolution, transferred all of the production and distribution assets to a newly formed New York corporation called Paramount Pictures Corporation, which became the new parent of Paramount Film. This new corporation expressly assumed the anti-trust liabilities of Paramount Pictures, Inc. Paramount Film did not assume such liabilities. It was not until January 1, 1950, that Paramount Film began to do business in Minnesota. It did receive, however, through its new parent, Paramount Pictures Corporation, the so-called production and distribution assets in this State formerly owned by Paramount Pictures, Inc.

By reason of its dissolution, Paramount Pictures, Inc., ceased doing business in Minnesota on December 31, 1949, and filed its certificate of withdrawal from this State on January 10, 1950. Under Minnesota law, Paramount Pictures, Inc., was amenable to service of process in this State for a three-year period thereafter. Consequently, Paramount Pictures, Inc., was amenable to suit at the time this proceeding was instituted on November 6, 1952. However, plaintiffs failed to avail themselves of the provision of the statute to which reference has been made and did not make Paramount Pictures, Inc., a party to this suit. Instead, they served Paramount Film, which company was not authorized to do business in this State until January 1, 1950, which date as will hereafter be indicated, was after the conspiracy had terminated as to Hollywood.

Plaintiffs advance several grounds as to why Paramount Film should be held liable for damages herein to the same extent as the other distributor defendants. They point out that Paramount Film was named as a defendant in the national conspiracy litigation (the Paramount cases), and they urge that that fact alone is sufficient to render this company responsible for the local acts of its fellow conspirators. But Paramount Film had nothing to do with this local conspiracy. It was not authorized to do business in this State during that period. The Paramount decrees alone cannot be the basis for a recovery of every unlawful act performed on a local level as to those who may have been parties to the national conspiracy. If that doctrine were to be applied, then any exhibitor or distributor defendant named in the Paramount cases could, without more, be held liable for the impact of any local conspiracy throughout the Nation although they were not doing business in the particular area and in no way participated in or even knew of the wrong which was committed.

Paramount Pictures, Inc., was the parent of Paramount Film. No contention is made that these corporations were not bona fide. The common directorate of the two corporations and the fact that some of the employees worked for both corporations will not permit their distinct corporate existence to be disregarded. No fraud or other illegal activities were practiced so as to estop either the parent or the subsidiary from urging its separate corporate existence. Here, plaintiffs seek to make the subsidiary, Paramount Film, liable for the wrongdoing of its parent. Plaintiffs had ample opportunity to sue the parent corporation, but it neglected to do so. The advent of Paramount Film into the State of Minnesota as a distributor of films for Paramount Pictures Corporation after the conspiracy had ended will not sustain plaintiffs' contention that it is liable for the acts of its former parent in a local conspiracy. Moreover, the isolated instances when Paramount Film's license contracts, sent from the State of Wisconsin where Paramount Film was authorized to do business, may have been used in Minnesota during the period in question when the Minneapolis office was short of license contract forms is of no par-

ticular significance. And the assignment by Paramount Pictures Corporation, the new parent of Paramount Film to the latter of certain production and distribution assets in this State formerly owned by Paramount Pictures, Inc., when it took over the Minneapolis Exchange, is likewise of no help to the plaintiffs in their attempt to hold Paramount Film liable for the acts of its parent. At least, Paramount Pictures, Inc., would be an indispensable party. There is no evidence here as to the amount or value of the local assets of Paramount Pictures, Inc., turned over to Paramount Film. That the similarity of names of the Paramount companies may have caused confusion even to those employed by the various Paramount companies may be admitted. But there is no showing that plaintiffs were in any way misled or confused by the similarity of the names. Certainly, there was no confusion over the fact that Paramount Pictures, Inc., was dissolved on December 31, 1949; that it filed its certificate of withdrawal from this State on January 10, 1950; that a three-year period existed thereafter for suits to be brought against it; that Paramount Pictures Corporation assumed the liabilities of Paramount Pictures, Inc.; and that Paramount Film was not authorized to do business in this State until January 1, 1950. There is an absence of any sound premise in the record upon which any liability for Hollywood's damages herein can be thrust upon Paramount Film.

■ As indicated above, the showing requires a finding that the preferential run obtained by Arion over Hollywood came to an end in 1948. Certain of the distributors in that year, at least, had entered upon a new plan of runs and clearances in Minneapolis, and although the plan of runs and clearances may be said to have been in a state of flux during that year, the break of the impasse theretofore maintained by the distributors in their refusal to accord independents equal availability with circuit theatres charging the same admission had taken place. A final decree had been entered in the Paramount cases and the national conspiracy was restrained. The evidence of the change in runs and clearances granted by the distributors in Minneapolis began to appear in 1948. At that time one Lowell Kaplan was the booking agent for Hollywood. Apparently, he made no attempt to obtain a better run for this theatre until April 6, 1949. He wrote a letter to all the defendant distributors on that date in behalf of Hollywood, as well as the Alhambra and El Lago theatres in Minneapolis, requesting a 28 day availability after the first run. On April 21, 1949, Paramount, while stating that it did not believe its best interests would be served by negotiating a 28 day availability, informed Kaplan that it would be willing to negotiate on the basis of a 42 day availability. However, on May 5, 1949, Kaplan wrote Paramount in answer to a letter of May 4, 1949, as follows:

"In answer to your letter of the 4th regarding your release 'El Paso' for the Alhambra, El Lago and Hollywood theatres, please be advised that we will not at that date be ready for the 28 day availability."

Arion was then on a 28 day availability. On May 6, 1949, Fox offered Hollywood an opportunity to bid competitively with Arion on a certain picture, but Hollywood took no action on the offer. Metro Goldwyn Mayer offered Hollywood, some time before September 26, 1949, an opportunity to bid on 14 pictures on a competitive basis for a 26 day availability. However, no bids were received from Hollywood. Plaintiffs' response is that all the distributors had not evidenced sufficient interest in response to Kaplan's letter requesting a 28 day availability, and hence Hollywood was justified in concluding that it could not obtain an even flow of sufficient pictures to justify a change from the 56 day availability which it then had. However, the evidence is quite clear that the distributors had abandoned their concerted effort to favor the circuit theatres by the end of the year 1948. Homewood, for instance, an independent theatre, was on a 28 day

run by Paramount in April, 1949. Riverside, likewise an independent theatre, was also at that time on a 28 day availability by Paramount. It is fair to find, therefore, that whatever differences there may have been in 1949 with reference to the availability granted to theatres in Minneapolis charging the same admission price, such differences were due to independent negotiations by the distributors and not by reason of any illegal combination. In any event, the Court is abundantly satisfied that, if Hollywood had attempted early in 1949 to negotiate for a better availability than 56 days after first run, it could have obtained a better run from sufficient distributors to enable it to maintain its theatre with an even flow of sufficient pictures. And the evidence is impelling that the straitjacket of runs and clearances which had been applied to Hollywood had been removed by the latter part of 1948. The unexpected freedom of market in that year may have confounded Hollywood as to its future policy. But such circumstances should not be charged against the defendants.

Presumably, the determination of Hollywood's damages, simply stated, is the computation of the net gross boxoffice returns that it would have obtained but for the conspiracy. But obviously that computation is laden with many difficulties. That Hollywood would have had to pay a higher film rental on a 49 day availability is evident. Moreover, that there would have been competitive bidding between the two theatres on many films is also highly probable. These occasions would tend to increase the film rental over that which Hollywood paid on a 56 day availability, and when some pictures would be played at each theatre day and date, the boxoffice grosses of each theatre would be diminished. It is, of course, difficult to predict with any degree of certainty the various situations which would have arisen if these two theatres in substantial competition had been on an equal availability. It is entirely possible that during some years Hollywood, as a new and more attractive theatre, would have outstripped Arion in patronage. On the other hand, when Charles Rubenstein was in the military service and during the war years, Arion, on a busy commercial street, may have far out-distanced Hollywood in gross boxoffice receipts.

As an alternative method of computing damages, plaintiffs have set forth the net boxoffice returns of Hollywood and Arion during the years in question and has computed the difference as Hollywood's pecuniary loss. In this schedule plaintiffs have listed Hollywood's average film rental as 25 per cent and Arion's average film rental as 29.4 per cent. However, there are many considerations which tend to emphasize the fallaciousness of that method of computing damages. From October 1, 1940, until January 7, 1943, Hollywood voluntarily lowered its admission price from 25 cents to 20 cents and then raised it to 22 cents, and during that period was on a 70 day availability. Moreover, during that period it was playing some 14 days behind the Columbia Heights Theatre, one of its substantial competitors. The boxoffice grosses of Hollywood indicate a substantial slump during this particular period. In 1939, Hollywood's boxoffice grosses totaled $47,864; in 1940, 1941 and 1942, $42,865, $42,905 and $42,839 respectively. In 1943, however, when it returned to the 25 cent admission, its boxoffice grosses jumped to $49,278. When Charles Rubenstein was in the military service from 1943 to 1946, other management controlled the policy of Hollywood, and with the advent of gas rationing during the war years and the advantages which accrued to theatres located in the bright-light commercial areas, the disparity between the boxoffice grosses of the two theatres is striking. In 1941, Arion's boxoffice grosses exceeded those of Hollywood by less than $5,000. In 1942, the excess of Arion over Hollywood was over $11,000; in 1943, Arion's excess was over $18,000; in 1944, the excess jumped to some $23,000; and in 1945, it was approximately $20,000. And in 1946 the spread in the grosses between the two theatres reached the all-time high of some

$30,000. These differences in grosses cannot be attributed solely to the differences in their availabilities for pictures after first run. That there was a substantial impact upon theatre patronage during the war years is well established. Moreover, it seems evident that, when there was a change in management of Hollywood's policy and the experience with a lower admission price resulting in a 70 day run some 14 days behind Columbia Heights, one must conclude that the difference between the grosses in the two theatres must be attributed in part to causative factors and conditions other than the preferential run granted to Arion.

Once it is recognized that the record will not justify a finding that Hollywood would have obtained a preferential run during this entire period over Arion but for the conspiracy, we are confronted with many uncertainties in attempting to arrive at a fair measure of damages. It is reasonably certain, however, that if these two theatres had been given the same availability by the distributors, there would have been just so much theatre patronage for them in the area in which they were operating. In all probability, the combined boxoffice grosses of the two theatres would not have been increased over that which the records now reflect. Some years Hollywood's may have exceeded Arion's, and on the other hand, during some years Arion's undoubtedly would have exceeded Hollywood's. It is to be doubted that during the twelve year period with the many changing conditions and the probable fluctuations between the two theatres as to their playing positions, there would have resulted a greater joint gross boxoffice return than that which actually was received. As stated heretofore, MAC once proposed that the net boxoffice grosses of the two theatres be pooled and divided between the theatres on an equal basis. It seems reasonable to consider that plan and utilize it as a means of determining Hollywood's loss herein. Under such an arrangement, the total gross returns of the two theatres would have to be totaled and a reasonable film rental deducted therefrom, and the balance then divided between the two theatres. The one which has not received its full share of the net boxoffice returns should be replenished as a measure of the damages sustained as a direct result of the conspiracy. A computation of damages on that basis appeals to the Court in light of all the evidence as a fair and equitable disposition of a most difficult problem. Granted that there may be other methods of arriving at the damages herein which probably could be supported by the record and which might increase or decrease the pecuniary loss arrived at by the method of pooling the earnings of the two theatres, the Court concludes, after a great deal of consideration and reflection, that the so-called pooling of gross boxoffice returns should be adopted. But the Court does not concur in defendants' contention that the actual joint gross returns should be subject to an arbitrary percentage diminution. Defendants contend that the combined grosses of the two theatres would have been diminished by at least twelve and one-half per cent if they played on an equal availability. But that percentage figure is not based upon any evidence, and defendants assume to proceed with an equally unsupported theory of damages when they assert that Hollywood sustained no pecuniary loss whatsoever by reason of being deprived of an equal run with Arion. The fact of damages is clearly established. The difficulty is to arrive at a sum which is realistic and sound. In any event, the Court is clear that substantial justice will be accorded Hollywood if the pecuniary loss it sustained is computed from September 6, 1936, to January 1, 1949.

This brings up the question of the formula for the film rentals which should be applied and deducted from the total grosses. Hollywood paid on an average of substantially 24.74 per cent of its gross as film rental, and Arion 29.37 per cent. It is reasonable to conclude that, with the granting of the 49 day availability to these two theatres in substan-

tial competition, there would be an effort, and a successful one on their part, to bring the film rental below the average rate paid by Arion. The selection of the mean average of 27.055 per cent as film rental seems justified.

Plaintiffs challenge the accuracy of the records of MAC as to the film rental actually paid by Arion. However, there is no reason to believe that MAC was not attempting to obtain as reasonable film rental as it could from the various distributors, and there is no reason to assume that the books during the period in question do not reflect the actual film rental paid. Certainly, there is no basis for plaintiffs' assertion that MAC had some sinister purpose in entering ficti-

tious film rentals on its books as to Arion's operations. The so-called blanket deals for films which MAC may have had with some of the distributors were relatively few and do not destroy the verity of MAC's computations on its books as to the film rental Arion paid from its gross boxoffice returns.

The following table will illustrate the Court's findings as to damages and the method employed in arriving at Hollywood's pecuniary loss. In that MAC by reason of the six-year statute of limitations has only a six-year damage period, to wit, six years prior to November 6, 1952, a break is indicated in the schedule as to MAC's liability for damages beginning November 6, 1946.

|  | Combined Gross | One-half to Hollywood | 27.055 Film Rental | Net Gross to Hollywood | Actual Hollywood Net Gross | Difference |
|---|---|---|---|---|---|---|
| 1937 | $107,821 | $53,910 | $14,585 | $39,325 | $36,816 | $ 2,509 |
| 1938 | 109,417 | 54,708 | 14,801 | 39,907 | 38,012 | 1,895 |
| 1939 | 102,531 | 51,265 | 13,870 | 37,395 | 35,816 | 1,579 |
| 1940 | 93,540 | 46,770 | 12,654 | 34,116 | 31,247 | 2,869 |
| 1941 | 90,542 | 45,271 | 12,248 | 33,023 | 31,921 | 1,102 |
| 1942 | 97,103 | 48,551 | 13,135 | 35,416 | 31,165 | 4,251 |
| 1943 | 117,108 | 58,554 | 15,842 | 42,712 | 36,949 | 5,763 |
| 1944 | 120,266 | 60,133 | 16,269 | 43,864 | 36,406 | 7,458 |
| 1945 | 119,009 | 59,504 | 16,099 | 43,405 | 36,607 | 6,798 |
| 1946 to 11/5 | 125,425 | 62,712 | 16,967 | 45,745 | 37,374 | 8,371 |
| 1946 after 11/5 | 23,737 | 11,868 | 3,211 | 8,657 | 7,320 | 1,337 |
| 1947 | 162,549 | 81,274 | 21,989 | 59,285 | 53,817 | 5,468 |
| 1948 | 158,959 | 79,479 | 21,503 | 57,976 | 51,253 | 6,723 |

Total, 1937 to 11/5/46, incl. $42,595
Total, 11/6/46 to 1948, incl. 13,528

Total, 1937 to 1948, incl. $56,123

In considering the method of computing damages as above set forth, it may be urged that the Court has given no effect to the war years when Arion's boxoffice gross probably would have exceeded Hollywood's if these two theatres had been playing on an equal availability. That is, of course, true. But, on the other hand, the Court has given no con-

sideration in its computation to the years when Hollywood, by reason of its attractiveness as a new theatre, probably would have exceeded Arion's boxoffice gross. The fluctuation in the grosses of the two theatres, if they had operated on an equal availability, would be fairly balanced, and the Court's computation of damages is reasonably determinative of the pecuni-

ary losses sustained by Hollywood as a direct result of the conspiracy.

MAC has interposed a counterclaim herein. It is not necessary to discuss its nature in that no evidence was offered in support thereof. Plaintiffs, therefore, are entitled to a dismissal of the counterclaim. In view of the Court's conclusions as to plaintiffs' failure to sue Paramount Pictures, Inc., and instead joined Paramount Film Distributing Corporation, not a party to this local conspiracy, that company cannot be held for any damages sustained by Hollywood and it follows that a dismissal should be entered in its behalf.

Findings of fact and conclusions of law consistent herewith may be presented by plaintiffs upon ten days' notice. At that time the motion of plaintiffs as to attorneys' fees to be allowed herein likewise may be noticed for hearing. Orders granting the dismissals above referred to also may be presented. Exceptions are reserved.