GLENDORA, Plaintiff,

v.

Charles F. DOLAN, John Tatta, William J. Bell, William J. Quinn, Marc A. Lustgarten, Joseph Azznara, James L. Dolan, Charles Forma, Robert S. Lemle, Irvin B. Polinsky, Thomas Garger, and Cablevision Systems Corporation, Defendants.

No. 94 Civ 2199 (VLB).

United States District Court,
S.D. New York.

May 5, 1994.

Glendora, pro se.

Robert M. Gallagy, Saterlee Stephens Burke & Burke, New York City, for defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This case grows out of the tension between the desire of Congress to make cable television a soapbox for diverse views and the risks created by any imposition of governmental control upon private entities involved in distributing cable materials to cable service providers. For the reasons which follow, it appears that in the context of the present case the objectives of the First Amendment are best served by permitting the marketplace to control decisionmaking by intermediate cable program syndicators such as the defendants here.

### II

Glendora, a creator of television programming, seeks relief against Cablevision Systems Corporation and several of its personnel for rejecting some of her programming. Defendants move to dismiss on various grounds, including the filing of two other lawsuits based on essentially the same factual contentions, 93 Civ 8344 (CLB) (SDNY), dismissed on February 28, 1994 after oral argument before Hon. Charles L. Brieant of this court on February 18, 1994 and County of Westchester Index # 94–03288 (filed March 7, 1994).

Defendants ask that their motion be converted into one for summary judgment under Fed.R.Civ.P. 12(b)(6) and 56 if appropriate, and they seek an injunction against further lawsuits brought by plaintiff against them.

While this case may properly be dismissed on procedural grounds alone because of the abuse of repetitive litigation involved, it is important that issues presented by *pro se* litigants raising matters of public concern also be addressed on the merits where appropriate. See *Soling v. New York*, 804

F.Supp. 532 (S.D.N.Y.1992). Consequently, the merits as well as the procedural problem presented here are treated below.

Plaintiff has filed a number of cross-motions which need not be considered in light of the disposition made of defendants' applications.

### III

The complaint is dismissed on the grounds that:

(a) Duplicative litigation is impermissible;

(b) No violation of the Constitution or any federal statute law has been set forth in plaintiff's papers; there is no reason to retain nonfederal claims, especially where state court litigation concerning the same matters is now pending.

■ Injunctive relief against plaintiff, while permissible under *In re Martin–Trigona*, 9 F.3d 226 (2d Cir.1993), should be considered only as a last resort and may be unnecessary. I have every confidence that plaintiff, now that her federal claims have been fully explored for a second time and the rule against overlapping lawsuits clearly set forth, will refrain from repeating the same contentions in this court.[1]

### IV

■ The rule against duplicative litigation prohibits both relitigation of the same claims as in the case of the present suit and 93 Civ 8344, and the bringing of claims which could have been brought in a prior suit but were not. *Smith v. Russell Sage College*, 54 N.Y.2d 185, 192–93, 445 N.Y.S.2d 68, 429 N.E.2d 746 (1981). Where a litigant is convinced that an error was made, the remedy is to appeal or to seek reconsideration or amendment of the ruling under Fed.R.Civ.P. 59 or 60. Lawsuits heaped upon lawsuits are counterproductive for all concerned. See

*Tetenes v. County of Rockland*, 146 F.R.D. 82 (S.D.N.Y.1993).

### V

■ The First Amendment to the Constitution provides that "Congress shall make no law ... abridging the freedom of speech, or of the press...." The Fourteenth Amendment, which applies First Amendment principles to state and local governmental entities, provides that no "state" shall deny life, liberty or property without due process of law. The basic assumption underlying these constitutional provisions is that private persons, if allowed liberty of expression, will create what has been called a "marketplace of ideas," Holmes, J. dissenting in *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919).

■ Governmental intervention affecting access to communication is permissible where scarcity of frequencies on the airwaves or similar shortages make rationing necessary in the public interest, but ordinarily not otherwise. See *NBC v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); *Preferred Communications v. City of Los Angeles*, 13 F.3d 1327 (9th Cir.1994); Comment, 46 Va L Rev 1391 (1960).

In an effort to promote rather than inhibit freedom of expression, the Cable Communications Policy Act of 1984, Public Law 98–549, 98 Stat 2779, calls upon cable service providers to "assure that cable communications provide ... the widest possible diversity of information sources and services to the public." 47 USC 521.

■ Where a portion of a cable operator's channels are dedicated to public use, 47 USC 531(e) provides in pertinent part that "a cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to this section."

---

1. Were plaintiff to disregard this gentle admonition, sanctions would be considered.

These may include a direction that any papers in connection with further suits brought in this court by plaintiff against any of the defendants must be accompanied by a copy of this memo-

randum order, and unless such papers set forth legally cognizable claims which were not, and could not have been, asserted in prior suits, such materials will be filed without being docketed. See *Schoolfield v. New York City Dept. of Corrections*, 1992 WL 296691, 1992 US Dist LEXIS 17590 (S.D.N.Y.1992).

The House Report on the Act considered public access channels, required to be provided by cable service providers, as "the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet." H Rep 934, 98th Cong, 2d Sess, reprinted in 1984 US Code Cong & Admin News 4655, 5667, quoted in *Alliance for Community Media v. F.C.C.*, 10 F.3d 812, 825 (D.C.Cir.1993).

Defendants ceased accepting cable material from plaintiff in part because it appeared to them that she had used the cable outlet to discuss pending personal lawsuits, triggering the long-standing and perhaps inevitable tension between the goals of free press and fair trials. While litigants may be barred from speaking about matters before the courts only in the most extraordinary circumstances, use of the electronic media to apply pressure to opposing litigants can be abusive. The extent, if any, to which such abuse may be restrained by governmental action is not now at issue.[2]

Since defendants here are not cable service providers but only intermediaries, any state or federal strictures placed upon rejection of material by cable operators are not applicable. Plaintiff has not contended that she has attempted to lease time available for public use and has been rejected by a cable operator; the defendants in the present suit would not in any event be accountable under 47 USC 531(e).[3]

■ The necessity to pay for leased time where one's media offerings are not accepted by an intermediary does not asphyxiate opportunities to be heard in our democratic Republic. Numerous electronic, print and other outlets are available. If the audience is interested in a viewpoint, it will often be profitable for commercial media to propagate it; even if they do not numerous interest groups have the opportunity to do so.

Experience indicates that this open-ended structure established under the First Amendment better serves diversity of viewpoints than reliance on lawsuits to attempt to require private entities not acting as public utilities to propagate matter they do not wish to accept.

The question in the present case is whether or not a private entity is required to act as an involuntary intermediary for broadcasting it does not wish to promote. No constitutional language, statutory provision, or case authority suggests that a basis for such a requirement can be found in any statute, decision, or provision of the Constitution of the United States.

## VI

Although the complaint is dismissed in its entirety, a concern must be expressed concerning the practice evident in the present complaint of including large numbers of individual defendants whose presence appears to be unnecessary to afford whatever relief might be appropriate should plaintiff prevail. Such action does not promote the "just, speedy and inexpensive" determination of the case which the court is directed to seek under Fed.R.Civ.P. 1.

SO ORDERED.

---

2. One unintended consequence of abuse of media to influence pending litigation may be the ability of the adversary affected to comment on the effort within the scope of the litigation, seeking to draw an adverse inference if appropriate. See *Chemical Bank v. Affiliated FM Insurance Co.*, 154 F.R.D. 91, (S.D.N.Y.1994).

3. Cable operators may, and are indeed encouraged to, provide channels for educational use, and also for use by institutional networks. Whereas direct cable operators operate to a large extent as public utilities, those involved in education and institutional activities are permitted to exercise editorial discretion without any restriction under the statutes involved here. 47 USC 351(b), (f).