289 F.2d 418
 COLUMBIA PICTURES CORPORATION, a Corporation et al., Appellants,
v.
CHARLES RUBENSTEIN, INC., a Corporation et al., Appellees.
CHARLES RUBENSTEIN, INC., a Corporation et al., Appellants,
v.
COLUMBIA PICTURES CORPORATION, a Corporation et al., Appellees.
 Nos. 16382, 16383.
 United States Court of Appeals Eighth Circuit.
 April 27, 1961.
 
 Mandt Torrision, St. Paul, Minn., for Columbia Pictures Corp. and others; Philip Neville, Minneapolis, Minn., and James, C. O'Neill, St. Paul, Minn., on the brief.
 Donald M. Fraser, Minneapolis, Minn., for Charles Rubenstein, Inc., and others; Larson, Lindquist, Fraser & Magnuson, Minneapolis, Minn., on the brief.
 Before SANBORN, WOODROUGH and MATTHES, Circuit Judges.
 WOODROUGH, Circuit Judge.
 
 
 1
 These are appeals from money judgments totalling $203,589 entered for plaintiffs by the District Court sitting without a jury in a treble damage action under the anti-trust laws. The appellants in No. 16,382 seek reversal of the judgments against them for alleged errors and also dismissal of the action on the merits. The appeals in No. 16,383 are by the plaintiffs in the action from the same judgments in their favor, but are on the sole grounds that the amount of the judgments awarded them are inadequate.
 
 
 2
 As to case No. 16,382.
 
 
 3
 The complaint filed on November 6, 1952, alleged a continuing national conspriacy in violation of the Sherman and Clayton Acts (15 U.S.C.A. 1 et seq. and 15 U.S.C.A. 12 et seq.) by eight distributors of motion pictures and by exhibitor of motion pictures referred to as M.A.C. which is the wholly owned subsidiary corporation of Paramount Pictures Inc., and was formally entitled Minnesota Amusement Company. It was alleged that the conspiracy was effected in Minneapolis, Minnesota by giving a neighborhood theatre in that city, operated by the exhibitor defendant M.A.C. called in Arion Theatre, a 'run' seven days ahead of the 'run' given the neighboorhood theatre operated by the plaintiffs about a mile away in the same city called the Hollywood Theatre, which was in competition with the Arion. The plaintiffs claimed they were entitled to have equal clearance for their Hollywood Theatre and that they suffered damage as the result of being required through the conspiracy to exhibit at the Hollywood Theatre seven days later than M.A.C. was permitted to and did exhibit at the Arion Theatre.
 
 
 4
 The Court found the conspiracy existed as charged; that the seven day prior run was effected through the conspiracy; that the run was unreasonable; that demand was made for equal clearance and was denied directly and proximately causing the damages to plaintiffs for which they were entitled to threefold recovery. The opinion of the court is published at 176 F.Supp. 527.
 
 
 5
 The evidence was that in 1936 before the seven day prior run was first given to the Arion Theatre, the Hollywood was a new theatre having been built in 1935 and was very attractive, while the Arion was old and in some respects out of date. The two theatres had cost about the same amount of $60,000 and had about the same seating capacity. Arion had a better location for motion picture theatre purposes. On account of its physical condition Arion was charging less admission than Hollywood's twenty-Five cent charge and was exhibiting on a later run. The capital stock of the plaintiff corporation operating the Hollywood was owned as a two family interest, one half by A. A. Kaplan and the other half by Louis Rubenstein and his immediate family. The Arion Theatre also belonged to Rubenstein and Kaplan, but was operated by M.A.C. under its lease from them. The competition between the two theatres was substantial and in the early part of 1936 negotiations were carried on between M.A.C. and its landlords with a view to establish working relations between them. The gist of the negotiations was proven by plaintiffs mainly through their introduction of the contemporaneous reports that M.A.C. made to the New York office of its parent Paramount Corporation. They showed thatM.A.C. first proposed to Rubenstein and Kaplan that the two theatres should be pooled and, although separately operated with Arion in an inferior charging and playing position 'as a cheaper theatre type', the profits should be divided. Both Rubenstein and Kaplan acted on the proposal in Hollywood's behalf and declined it. Mr. Rubenstein said, 'That in the event the Arion was reconditioned, modernized and re-equipped it might then be possible to discuss this idea and plan more definitely.' M.A.C. thereupon took up the matter of improving the physical condition of Arion. It caused its agent, John A. Branton, (called as a witness by the plaintffs) to negotiate tentatively with distributors for a run for Arion slightly ahead of Hollywood. Branton obtained the run for Arion seven days ahead of Hollywood provided that Arion should be improved to a condition where it could and would raise its admission from the fifteen cents it was getting to twnty-five cents. This was reported to the New York office in May, 1936. M.A.C. then appealed to its landlords, Rubenstein and Kaplan, to pay or contribute to the necessary expenses to bring the Arion up to a competitive condition and they refused. Louis Rubenstein said, 'It would be inconsistent for the landlords to contribute to the cost of improving the Arion, thereby making that theatre more specifically competitive with the Hollywood.' The cost of the necessary improvements to Arion was $16,000 and after failing to induce the landlords to pay any part, M.A.C. considered paying for them itself. The lease had only seven years to run and contained no option for renewal. It provided that the lessee will 'not make any changes in the general nature, design or structure of the building or improvements upon the demised premises' without first submitting 'drawings, plans and specifications' to the lessors and securing lessors' approval thereof.
 
 
 6
 Accordingly, M.A.C. applied to Rubenstein and Kaplan for their approval of M.A.C. making the necessary improvements to the Arion Theatre at its own expense to enable it to comply with the condition upon which it was granted the run seven days ahead of Hollywood. Rubenstein and Kaplan gave their consent in writing June 1, 1936. M.A.C. then had the improvements made, raised its admission charge to twenty-five cents and proceeded to exhibit at the Arion Theatre on that 'run' ahead of the Hollywood in September, 1936. It continued to do so through the remaining years of the lease and thereafter during an additional period of ten years after the lease was extended by the parties. Neither Louis Rubenstein nor A. A. Kaplan ever raised any question or made any objection in respect to the playing position of the two theatres, or requested that the Hollywood be put on an equal clearance with Arion. The claims for damages in the present action are asserted only after the lease of Arion as extended had expired and all its advantage to the owners of the property had been availed of. The defendant M.A.C., which exhibited the pictures at the Arion ahead of Hollywood throughout the many years, was never given any intimation either before or after it took the playing position that there was any objection ot its doing so.
 
 
 7
 It has been settled, we think rightly so in numerous anti-trust cases, that where the plaintiffs seek to recover for defendant's denial through conspiracy of a run or clearance to which plaintiffs were entitled, plaintiffs cannot recover damages 'unless they made demand for that of which they now claim they were deprived by the conspiracy.' J. J. Theatres Inc. v. Twentieth Century-Fox Film Corp., 2 Cir., 212 F.2d 840, 845. 'In order for plaintiffs to recover for defendants' denial of runs and clearances to them, plaintiffs must show that they requested defendants to grant them such runs and clearances.' Vilastor-Kent Theatre Corp. v. Brandt, D.C.S.D.N.Y.1955, 18 F.R.D. 199, 200, 'In the absence of such demand upon the part of (the) plaintiffs, the courts have consistently held there can be no recovery in an antitrust action.' Lawlor v. National Screen Service Corp., 3 Cir., 1959,270 F.2d 146, 154.
 
 
 8
 The action here is based on the claim that plaintiffs were entitled to equal clearance for the Hollywood Theatre and the Arion Theatre, and that the damage for which they sue resulted from denial of that equality of clearance through the conspiracy of the defendants.
 
 
 9
 It was a foremost contention for defendants at the trial and it is reiterated here that Louis Rubenstein and A. A. Kaplan who owned the Arion Theatre, as well as almost all of the stock in the plaintiff corporation, Charles Rubenstein Inc., never requested an equal run for Hollywood with Arion and thereby consented to the prior playing position of Arion ahead of Hollywood, that they were satisfied therewith and acquiesced therein, and that the entire course of dealings were such that Charles Rubenstein Inc., could not recover damages for any losses claimed to have been suffered as a result of such prior playing position granted to the Arion. But the court found as fact that, 'Charles Rubenstein as manager in active charge of the Hollywood repeatedly protested in the years 1936 and 1937 to the branch managers of most of the distributors against the preferential run of the Arion and requested that the Hollywood be accorded the same availability as the Arion. Such protests were rejected and the requests refused.'
 
 
 10
 There was a further finding that the plaintiff, Charles Rubenstein Inc., 'did not at any time consent to or acquiesce in the grant to the Arion of a preferential playing position ahead of the Hollywood.'
 
 
 11
 Study of the record has convinced us that substantial evidence support those findings and they are not clearly erroneous. Although Louis Rubenstein and A. A. Kaplan probably wanted M.A.C. to improve their Arion property as it did and consented to the improvements knowing that a better playing position for Arion would result, the court was not clearly wrong in holding that there was no proof of consent by the plaintiff, Charles Rubenstein Inc., to the prior clearance of ahead of Hollywood. The Hollywood property had been turned over to the corporation and the protests on its behalf were made by its President and managing officer, Charles Rubenstein.
 
 
 12
 Notwithstanding that, there was some evidence that although Louis Rubenstein and A. A. Kaplan had put their Hollywood Theatre into the corporate form, it was in fact their joint enterprise. They continued to control its affirs and neither of them requested equal clearance for Hollywood or objected to the short priority given Arion though they had knowledge of this clearance. We conclude that there was sufficient grounds for the court's holding, that in the years 1936 and 1937 Chalres Rubenstein made request of certain distributors' agents for equal clearance for Hollywood and protested to them against the priority given to Arion, and the corporate plaintiff, Charles Rubentein Inc., was not precluded from maintaining this action for failure to complain and to make a demand.
 
 
 13
 Appellants assail as clearly erroneous the findings made by the court of a conspiracy to grant unreasonable preferential runs to M.A.C. suburban theatres, including the run to Arion seven days ahead of Hollywood, but there was substantial evidence to support the findings and the court's opinion explains and justifies them. The receiving in evidence of the Paramount decrees which is also attacked is supported in the following cases. Twentieth Century-Fox Corp. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846, certiorari denied 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348; Loew's Inc. et al. v. Cinema Amusements, 10 Cir., 210 F.2d 86; Homewood Theatre v. Loew's, D.C.Minn., 110 F.Supp. 398, appeal dismissed 8 Cir., 207 F.2d 263; Sablosky v. Paramount Film Distributing Corp., D.C.E.D.Pa., 137 F.Supp. 929; Don George, Inc. v. Paramount Pictures, D.C.La., 111 F.Supp. 458; DeLuxe Theatre Corp. v. Balaban & Katz Corp., D.C.Ill., 95 F.Supp. 983. There was no error in receiving the decrees in evidence.
 
 
 14
 Upon the hearing of the motion of M.A.C. for partial judgment by applying the Minnesota statute of limitation, the court adjudicated that the state's six year statute of limitation, M.S.A. 541.05, was applicable to the case of the plaintiffs. It is contended that the ruling was erroneous. We have carefully reviewed the question as raised and find no error in the court's interpretation of the statute as explained in the opinions in Homewood Theatre v. Loew's Inc., D.C.Minn. 1951, 101 F.Supp. 76 and in Charles Rubenstein Inc. v. Columbia Pictures Corp., D.C., 154 F.Supp. 216.
 
 
 15
 Appellants also complain of the court's finding that 'The Hollywood Theatre was certainly and clearly damaged as a direct and proximate result of the conspiracy among among the defendants. * * * The preferential run granted to the Arion and the clearance of the Arion over the Hollywood.' We conclude that there was substantial evidence to support the finding as shown in the court's opinion and do not consider it clearly erroneous.
 
 
 16
 Turning to the case for the plaintiff Rubenstein & Kaplan, a partnership of Abraham Kaplan, Charles Rubenstein and Anna Rubenstein, and Charles Rubenstein and Anna Rubenstein as Trustees for Arnold Rubenstein and Sheldon Rubenstein, d/b/a Hollywood Theatre, we find a different situation.
 
 
 17
 The lease of the Arion Theatre from Louis Rubenstein and A. A. Kaplan to M.A.C. would have expired in April, 1943 and negotiations for renewal or extension of it were carried on in 1942. Louis Rubenstein had died in 1939 and his one half interest in the Arion devolved to his widow who is the mother of Charles Rubenstein and was represented by him in the negotiations. The Arion had then been playing on its run seven days ahead of the Hollywood for about six years and Charles Rubenstein testified that he assumed it would continue to do so. He also testified that he had never at any time had a discussion of the Arion and Hollywood's playing positions with a representative of the defendant M.A.C. It was considered in the negotiation with M.A.C. concerning the renewal or extension of the lease that M.A.C. might drop the Arion lease, but the lessors insisted on a package deal for two of their theatres, the Arion and the Granada. An extension of the lease of the Arion for an additional ten year period was voluntarily agreed upon and entered into without any intimation given to M.A.C. that there was any dissatisfaction with the playing positions of the Hollywood and Arion theatres. Those playing positions were continued without objection by the partnership throughout the extended period of the Arion lease and always without any notice of dissatisfaction to M.A.C. In the fall of 1942, Charles Rubenstein entered the military service and the Hollywood Theatre was leased to the plaintiff partnership which operated it throughout the rest of the damage period. The partnership on taking over made no objection or demand and raised no question concerning the playing positions of the two theatres, but continued to operate under the clearance established in 1936.
 
 
 18
 The parties and the court recognized at the trial that it was necessary for plaintiffs to prove that demand had been made for the equal clearance of the two theatres and that the demand was denied to their damage. As we have noted, Charles Rubenstein, as managing officer of the corporation operating the Hollywood Theatre, gave the testimony that he had orally made such demand for that corporation. In 1942, the year when the lease of the Arion Theatre was extended for ten years, the partnership took a lease of the Hollywood and became its operator during the following years of the damage period. No demand for equal clearance for the two theatres was made on behalf of the partnership.
 
 
 19
 Appellants have earnestly contended in this Court as they did in the District Court, that even if recovery should be awarded the corporation plaintiff up to 1942, that after the extension of the Arion lease in that year and the change of possession and operation of the Hollywood recovery should be denied. The District Court considered the contentions with meticulous care and when appellants' motion for amended findings, conclusions and judgment was considered and denied, a memorandum opinion (not published) supplementing the published opinion accompanied the order. The following i.a. was included:
 
 
 20
 '* * * The Court adheres to the findings of fact and conclusions of law heretofore filed. However, it may not be amiss for the Court to comment somewhat more extensively upon the contention of the Minnesota Amusement Company that plaintiffs should not recover any damages for the period after the 1942 negotiations between it and the lessors of the Arion Theatre for a renewal of the Arion lease. This matter was specifically considered in the Court's memorandum decision of January 27, 1959, (176 F.Supp. 527) and were it not for the very earnest contention on the part of MAC that the Court had erred in its views in considering that question, I would be content with the simple statement that I am not convinced that the defendant has sustained the burden in establishing an estoppel on the part of plaintiffs to seek damages after 1942 and that there is an absence of sufficient evidence to justify a finding that plaintiffs waived Hollywood's objection to Arion's preferred run after that year or that they consented or acquisced in Arion's so-called circuit run after 1942.
 
 
 21
 'One must consider the conduct of the parties in light of the situation and circumstances which existed at the time the leases of the Arion and Granada Theatres were renewed. The Court is abundantly satisfied that frequent objection was voiced by Hollywood as to Arion's preferred playing position when MAC, by reason of its dominant economic power and strength, summarily demanded and received from the other defendant distributors a preferred playing position over Hollywood. When Hollywood's objections and protests resulted in no amelioration of its inferior playing position with respect to Arion, it had no alternative but to compete with Arion by way of such means and business methods as were available to it. To continue to repeat such demands or protests year after year would have been an utterly futile ceremony. Hollywood knew that it was subject to the same dominance that befell most, if not all, of the independent theatres in the city. The granting of the so-called circuit run to the Paradise Theatre, an independent theatre, cannot be cited as an example of any break in the tightness of MAC's control of the runs and clearances in Minneapolis during these years. Concessions to the Paradise Theatre merely represented the result of threats of litigation by a formidable independent theatre chain.
 
 
 22
 'The Arion lessors were Messrs. Kaplan and Rubenstein, who were stockholders in Hollywood. They also had leased the Granada Theatre to MAC. The Hollywood Theatre was owned by Charles Rubenstein, Inc., a corporation. Charles Rubenstein was the President and active manager of the company in 1942. He never had any ownership interest in the Arion Theatre. In May, 1942, when negotiations were under way for a renewal of the Arion lease which expired in 1943, Kaplan, the surviving partner of Kaplan and Rubenstein, was the dominant person who conducted the negotiations for the partnership. He apparently was assisted by Charles Rubenstein, who represented his mother. Louis Rubenstein, father of Charles, had died and his widow, Anna Rubenstein, had inherited his interest. Although the family relationship between the owners of the Arion and the stockholders of Hollywood were close, we are nevertheless dealing with distinct and separate entities. The lessors of Arion had no control over the operation of Hollywood until after the Arion lease had been renewed and after Charles Rubenstein, the manager and President of Hollywood, was inducted into the Armed Services in September, 1942.
 
 
 23
 'MAC now takes the position that when the negotiations for renewal of the Arion lease were under way, a duty rested upon the lessors of Arion-- presumably by reason of the fact that they were stockholders of Hollywood-- to renew dissatisfaction with Hollywood's playing position. In addition, MAC contends that if Hollywood was dissatisfied with its run, it should have insisted upon some provision in the lease of Arion which would have forbidden Arion from engaging in any discrimination as to Hollywood. Now, obviously, no such duty rested upon the lessors as stockholders of Hollywood. The genesis of the conspiracy as to Hollywood in 1936 did not come about by reason of the stockholder relationship between the lessors of Arion and Hollywood. Nor did that relationship have any bearing upon the continuance of the conspiracy after the Arion lease was renewed. MAC was is no way lulled into believing that because the Arion lease existed, or because it was renewed, it would be immunized from any liability by reason of its participation in the conspiracy against Hollywood.
 
 
 24
 'MAC contends that it was losing money on the operation of Arion, but that it was required to renew the Arion lease in order to obtain the Granada lease. In other words, that the lessors of Arion insisted on a so-called package deal-- that is, both theatres had to be taken by MAC or neither would be leased. If it be a fact that the operation of Arion was a losing venture for MAC, it is difficult to reconcile the statement of Mr. Friedl, President of MAC, to his superiors on March 4, 1942, in referring to the Arion and Granada Theatres, that 'we believe we should retain both of these theatres.' In any event, the operation of Arion by MAC must have fitted into the pattern of its plan during these years. It apparently wanted a circuit theatre in that section of northeast Minneapolis. But MAC now asserts that if it knew that in obtaining a renewal of the Arion lease in 1942 it was going to be confronted with an anti-trust lawsuit growing out of its operations, it never would have taken the lease. Undoubtedly that may be true. But MAC's conspiratorial anti-trust action was objected to and protested by Hollywood early in 1936 and 1937. MAC knew, or should have known, that despite the protests and objections of Hollywood, it intentionally continued with its unlawful discrimination, with the knowing concert of action on the part of the defendant distributors which had for its object the denial to Hollywood of a free market in the operation of its theatre. It knew, or should have known, that as long as such conspiratorial conduct continued, all of the conspirators would be amenable to the Nation's anti-trust laws. There is not the slightest hint in the record that MAC relief upon the renewal of the Arion lease as forgiveness of its wrongdoing, or that it was misled with respect thereto by the silence of the Hollywood stockholders who conducted the negotiations for the renewal of the lease. The distributor defendants, of course, had no knowledge whatsoever of these transactions or negotiations and cannot be heard to contend that they were in any way misled by reason of the renewal of the lease or that the conduct of the lessors of Arion estops these plaintiffs from recovering any damages after May, 1942. * * *
 
 
 25
 'The Court is clear that MAC has not sustained the burden in establishing that the negotiations and circumstances surrounding the renewal of the Arion lease in any way deprived these plaintiffs from recovering damages after May, 1942. * * *'
 
 
 26
 The majority of this Court is convinced that the District Court's findings and conclusions set forth in the published opinion and supplement above, properly determined the issues presented in favor of the plaintiffs in the action and are without error.
 
 
 27
 In case No. 16,383.
 
 
 28
 We agree with the District Court that measuring the amount of damages posed a very difficult problem. The method the court arrived at and applied and the reasons justifying it are clearly set forth in the published opinion. Appellants in this appeal complain particularly that the court's method involved making a computation as though the two theatres of similar merit were pooled and it is pointed out that such pooling is illegal in violation of anti-trust laws and such pooling did not occur. But in that regard, as clearly appears in the Paramount decrees, the illegal monopoly here involved has resulted as well from combining theatres into the monopoly through leases as through pooling. We do not discern any better way to arrive at a fair judgment upon the amount of damages than the informed appraisal made by the court.
 
 
 29
 The judgments appealed from in No. 16,382 and No. 16,383 are in all respects, affirmed.