**2361 STATE CORPORATION,** formerly known as **A. Brandwein & Company,** an Illinois corporation, Plaintiff,

v.

**SEALY, INCORPORATED,** Carl N. Singer, Sealy Mattress Company, Morris A. Kaplan, Montgomery Ward & Company, Inc., Defendants.

No. 65 C 361.

United States District Court
N. D. Illinois, E. D.

Jan. 25, 1967.

Maurice P. Raizes, Jack A. Cohon, Chicago, Ill., Cohon & Raizes, Chicago, Ill., of counsel, for plaintiff.

Richard W. McLaren, Richard S. Rhodes, David L. Aufderstrasse, Chicago, Ill., Chadwell, Keck, Kayser, Ruggles & McLaren, Chicago, Ill., of counsel, for defendants Sealy, Inc., Sealy Mattress Co.

Narcisse A. Brown, Chicago, Ill., for defendant Ward.

## MEMORANDUM OPINION

AUSTIN, District Judge.

Plaintiff[1] sues to recover damages, as provided in Section 4[2] of the Clayton Act, for injuries allegedly sustained as the result of violations by the defendants of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Discovery is virtually complete. After careful consideration of the entire record, it appears at this time that substantial questions of fact remain and that defendants' motion for summary judgment can be sustained only in part.

The record discloses the following undisputed facts. Defendant Ward is a national retailer of merchandise. Among the many items Ward sells is cotton innerspring and matching box spring bedding. Ward sells nationally advertised brands of such bedding as well as bedding manufactured for Ward to sell under its own brand name, "Style House," so-called "private-label" bedding.

Prior to 1961, it was Ward's policy to purchase its private-label bedding from independent manufacturers of bedding located near its stores throughout the country. Included among those manufacturers was the plaintiff who for many years prior to 1961 manufactured and sold private-label bedding to Ward. Plaintiff's sales were confined to Ward stores in the midwestern States.[3] Beginning late in 1959, Ward set out to select a single resource able to supply Ward's private-label bedding needs on a nation-wide basis. Ward considered a number of manufacturers who were ostensibly able to do this. Early in 1961, Ward selected Sealy, Inc. (Sealy) as its "major resource" for its private-label bedding needs. Contemporaneously with its selection of Sealy as its national supplier of private-label bedding, Ward notified all of the bedding manufacturers who were then supplying its private-label bedding needs that Ward intended to deal with them no longer. Among those notified was the plaintiff. After receiving notice, plaintiff endeavored to retain its Ward business, but Ward informed plaintiff that its decision to purchase its private-label bedding "requirements" from Sealy alone was "irrevocable." Ward in fact did purchase any private-label bedding in the years 1961 to 1964 inclusive, the period specified in the complaint, from

---

1. Plaintiff 2361 State Corporation is the successor to A. Brandwein & Co. which was engaged in the bedding business. In 1964, Brandwein sold its bedding inventory and good will to the defendant, Sealy, Inc.

2. Section 4 of the Clayton Act provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 38 Stat. 731 (1914), 15 U.S.C. § 15 (1958).

3. Plaintiff sold its bedding products to Ward stores located in Colorado, Illinois, Iowa, Indiana, Kentucky, Michigan, Minnesota, Missouri, Ohio, Pennsylvania and Wisconsin.

a source other than Sealy except for purchases of private-label bedding in August, 1963, from Englander, Inc., and in 1964 from Waynewood, Inc. and Wickline Bedding Company.

Ward in fact purchased nothing from Sealy, Inc., however, because Sealy, Inc. functions in this context as a national sales agent for a number of independent manufacturers of bedding who have agreed to participate in what Sealy calls its "national accounts" program. Participants in this program designate Sealy as their agent to solicit the business of, and contract for the sale of bedding to, national purchasers such as Ward. The participating manufacturers here agreed to sell bedding to the Ward stores that was manufactured to specifications dictated by Sealy only in the territory assigned to them by Sealy and only at prices specified by Sealy. The participants in the Sealy national accounts program were the same manufacturers who produce bedding under the Sealy trademark pursuant to license agreement. Here, however, no bedding produced under the Sealy trademark is involved.

The complaint, filed March 10, 1965, alleges that Section 1 of the Sherman Act[4] has been violated because all defendants conspired to prevent firms other than participants in the Sealy national accounts program "from selling cotton and innerspring mattresses and matching box springs" to Ward. This conspiracy allegedly consisted of a "continuing agreement" among the defendants that only participants in the Sealy program would sell cotton and innerspring bedding to Ward at prices determined by Sealy, and that Ward "would not purchase" any such bedding "from any competitor" of a participant in the Sealy program. It is further alleged that between October, 1961, and February, 1964, this conspiracy was implemented by an exclusive dealing agreement between Ward and Sealy, Inc. in violation of Section 3 of the Clayton Act.[5]

The complaint also alleges a violation of Section 2 of the Sherman Act,[6] but it does nothing more than state that Section 2 has been violated. Nowhere does plaintiff discuss monopoly power, the relevant market, or whether the purpose or effect of the charged conspiracy was to monopolize or to attempt to monopolize.

All defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendants assert that they are entitled to judgment as a matter of law because (1) the statute of limitations bars the action, (2) plaintiff was not in fact damaged as a result of any loss of the Ward business, (3) there was no exclusive dealing agreement between Ward and Sealy or the participants in its national accounts program, and (4) there was no

---

4. In pertinent part, Section 1 of the Sherman Act provides:

 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *" 26 Stat. 209 (1890), 15 U.S.C. § 1 (1958).

5. In pertinent part, Section 3 of the Clayton Act reads:

 "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods * * * of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 38 Stat. 731 (1914), 15 U.S.C. § 14 (1958).

6. Section 2 of the Sherman Act reads in part:

 "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *" 26 Stat. 209 (1890) 15 U.S.C. § 2 (1958).

"conspiracy" among the defendants to foreclose plaintiff and others similarly situated from selling bedding to Ward.

The record clearly demonstrates that it is the termination of plaintiff as a supplier of Ward in compliance with the alleged exclusive dealing agreement that is the heart of plaintiff's complaint. The complaint, read most liberally, charges nothing more, and the proceedings to date show clearly that absent an unlawful exclusive dealing agreement, plaintiff may not recover. Of particular import is the fact that during the period the alleged unlawful exclusive dealing agreement was in effect, plaintiff states that it stood ready to sell Ward bedding of like quality and price as that offered to Ward by Sealy.[7]

## I. *The Statute of Limitations.*

 Section 4B of the Clayton Act[8] is not to be narrowly construed. Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 210 F.Supp. 557 (N.D.Ill.1962), aff'd 315 F.2d 558 (7th Cir. 1963). Section 4B of the Clayton Act was designed not to eliminate a cause of action but rather to create a uniform period throughout the nation for the commencement of suit. Westinghouse Electric Corp. v. Pacific Gas & Electric Co., 326 F.2d 575 (9th Cir. 1964). Plaintiff in a civil antitrust action has four years from the date on which an act in violation of the antitrust laws inflicting damage or injury to him occurred to sue the actor, be it the first or last act

committed in violation of the antitrust laws. Crummer Co. v. DuPont, 223 F.2d 238 (5th Cir. 1955); Norman Tobacco & Candy Co. v. Gillette Safety Razor Co., 197 F.Supp. 333 (N.D.Ala.1963), aff'd on other grounds, 295 F.2d 362 (5th Cir. 1961); Charles Rubenstein, Inc. v. Columbia Pictures Corp., 154 F.Supp. 216 (D.Minn.1957), aff'd on other grounds, 289 F.2d 418 (8th Cir. 1961); Steiner v. 20th Century Fox Film Corp., 232 F.2d 190 (9th Cir. 1956); Garelick v. Goerlich's Inc., 323 F.2d 854 (6th Cir. 1963). These cases, and Baldwin v. Loew's Inc., 312 F.2d 387 (7th Cir. 1963), make it clear that a plaintiff has four years within which to bring a civil suit for any act *causing injury or damage.*

 Defendants rely in part on Momand v. Universal Film Exchanges, Inc., 172 F.2d 37 (1st Cir. 1948), and Baldwin v. Loew's Inc., supra. These cases demonstrate only that the statute of limitations does not commence to run against the instigation of criminal proceedings until the commission of the last overt act in compliance with the conspiracy regardless of whether the act causes injury or damage. Applying these principles here, it is clear that the statute of limitations commenced to run from the date on which the plaintiff first sustained injury as the result of the alleged exclusive dealing agreement.

The record shows beyond any genuine question that plaintiff was notified in February or early in March, 1961,[9] that

---

7. Plaintiff stresses this fact in its complaint, par. 16, in its Answers to Interrogatories, Ans. 11(c), and on oral argument.

8. Section 4B of the Clayton Act provides in pertinent part:
 "Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued."
 69 Stat. 283 (1955), 15 U.S.C. § 15b (1958).

9. Plaintiff first heard the news via industry rumor. Several days later, it verified the information with Ward and was

fully informed as to the meaning of Ward's decision to use only Sealy as a source for private-label bedding. The precise dates of when plaintiff first heard the rumor or had this conversation do not appear. On March 3, 1961, Ward management sent a notice to its stores of this decision to use only Sealy as a source of private-label inner spring bedding. This notice contains the statement that "All our present suppliers have been informed of our decision to make this change." Intracorporate correspondence of Sealy dated January 29, 1961, indicates that Ward intended to notify its suppliers of the decision to use only Sealy by January 30, 1961. For these reasons, the Court

Ward intended to terminate plaintiff as a supplier and that this decision was irrevocable. Plaintiff last sold beds to Ward in August, 1961. Suit was filed March 10, 1965. With the case in this posture, defendants insist that it is controlled by Emich Motors Co. v. General Motors Corp., 229 F.2d 714 (7th Cir. 1956).

■ This cannot be so, however, because in *Emich*, unlike here, a specific contractual relationship between the parties was in existence, and plaintiff there clearly had the right to bring suit for unlawful breach of the contract upon receiving notice of termination. 229 F.2d at 720. Here no contract existed between the parties, and Ward's notice terminated nothing of legal significance. That plaintiff received notice more than four years prior to the commencement of this suit of Ward's decision to eliminate plaintiff as a supplier at some point in the future does not bar plaintiff's right to recover. At most, all that is barred is plaintiff's right to recover damages for injuries sustained as the actual result of receiving notice, here none. When plaintiff was notified of Ward's decision not to enter into any future agreements to purchase bedding from the plaintiff, it sustained no real injury since Ward at that time and for many months thereafter continued to purchase bedding from plaintiff. Plaintiff had no right to maintain suit until it was in fact injured, and plaintiff sustained no injury as a result of the

alleged exclusive dealing agreement until Ward put that agreement into effect by actually ceasing to purchase plaintiff's bedding. This occurred in August, 1961. In light of all these facts, plaintiff had at least until August, 1965, to commence this action; since it did so in March, 1965, the suit is not barred by limitations.

■ The Court *sua sponte* has considered the applicability here of Section 5(b) of the Clayton Act, 15 U.S.C. § 16(b).[10] Section 5(b) of the Act tolls the statute of limitations during the pendency of any government proceeding as to private rights of action based in whole or in part upon matters involved in the government proceeding. There is presently pending before the Supreme Court a suit by the government challenging the legality of territorial restrictions found in the licensing agreements concerning the use of the "Sealy" trademark by Sealy, Inc. and its licensees, such as Sealy Mattress Company of Chicago. Those agreements also contained pricing restrictions which were found by this Court to constitute *per se* violations of the antitrust laws. That finding stands unchallenged. The Sealy national accounts program assailed here operates in much the same fashion. Were plaintiff allegedly injured by the operation of this program, Section 5(b) would operate to suspend the statute of limitations because there is substantial identity in operation and effect between the Sealy trademark licensing program

agrees with the defendants that there is no genuine issue of fact as to when plaintiff was notified of Ward's decision to use only Sealy, Inc., and the Court accepts the date suggested by defendants, March 4, 1961, as the last possible date on which plaintiff might have received notice of termination by Ward.

10. Section 5(b), 15 U.S.C. § 16(b) provides:

"(b) Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the stat-

ute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: Provided, however, That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued."

and its national accounts program. Leh v. General Petroleum Corp., 382 U.S. 54, 86 S.Ct. 203, 15 L.Ed.2d 1134 (1965). Plaintiff's injury, if any, however, stems solely from the fact that it was allegedly foreclosed from competing for Ward's business, and that is true only if there was in existence an exclusive dealing agreement between Ward and Sealy. Nothing in the complaint alleges that either the territorial allocation or pricing aspects of the Sealy national accounts program were the responsible agents of plaintiff's injury. Neither does the complaint allege, nor does the record demonstrate, that the anticompetitive effects of these two presumably offensive aspects of the Sealy national accounts program were the inducing factors to Ward to enter into the alleged exclusive dealing agreement. Indeed, plaintiff insists in its complaint and brief and on oral argument that its prices to Ward equalled those of Sealy. Thus plaintiff has not been injured by virtue of the pricing aspects of the Sealy national accounts program because, by its own admission, it was able to compete with participants in the Sealy program in the territory where plaintiff operated, the only territory that is here involved. Thus plaintiff, uninjured by the Sealy national accounts program, has no standing to challenge it. Thus it is not necessary to consider the legality of the Sealy national accounts program, and the Court in no way implies any opinion as to its propriety.

■ In no event, however, would Section 5(b) operate to save plaintiff's cause of action against defendant Ward since Ward was not named as a defendant in the government proceeding, see Sun Theatre Corp. v. RKO Radio Pictures, Inc., 213 F.2d 284 (7th Cir. 1954); Grengs v. Twentieth Century Fox Film Corp., 232 F.2d 325 (7th Cir. 1956), cert. denied 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 77 (1956); Columbia Pictures Corp. v. Charles Rubenstein, Inc., 289 F.2d 418 (8th Cir. 1961), especially where, as here, the allegedly unlawful conduct of Ward is totally unrelated to the subject matter of the government suit against Sealy, Inc. Cf. State of Michigan v. Morton Salt Co., 259 F.Supp. 35 (D.Minn.1966).

Neither the precise conduct which was the proximate cause of plaintiff's injury, the alleged exclusive dealing agreement, nor even the general question of the impact of the Sealy licensing agreements upon non-participants, was involved in the government proceeding against Sealy, Inc. Section 5(b) of the Clayton Act, therefore, has no application to this proceeding for the reason that the subject matter of this complaint lacks substantial identity with the subject matter of the government action. Leh v. General Petroleum Corp., supra.

II. *Damages.*

Defendants insist that even if there is present here a violation of the antitrust laws, plaintiff has not in fact been injured by it. This poses a serious problem. It appears without dispute that plaintiff operated at a loss for the eight fiscal years prior to the termination by Ward as well as for the three years plaintiff remained in business thereafter, and that after termination by Ward, plaintiff's net operating losses were less. Plaintiff had gross profits during the years in question, and the gross profits of plaintiff were less after it lost the Ward business, and the record shows that plaintiff realized a profit on at least some of its sales to Ward.[11] In light of these facts, defendants insist plaintiff's recovery is barred by the principles announced in Wolfe v. National Lead Co., 225 F.2d 427 (9th Cir. 1955) and Siegfried v. Kansas City Star Co., 193 F.Supp. 427 (W.D.Mo.1961), aff'd 298 F.2d 1 (8th Cir. 1962). In this connection, McCleneghan v. Union Stockyards of Omaha, 349 F.2d 53 (8th Cir. 1965) should also be read.

■ It is not clear at this point whether defendants' position is well tak-

11. Affidavit of Harry Brandwein.

en. The record does not reveal whether plaintiff's losses were occasioned solely by unprofitable bedding operations or whether other factors unrelated to plaintiff's bedding business were responsible for the losses. The cases relied upon by defendants do establish, however, that plaintiff may recover only those damages that were proximately caused by the allegedly unlawful acts of defendants and whose amount is not purely speculative; that plaintiff may not recover if its bedding operations considered as a whole resulted in larger net profits (or smaller net losses) during the existence of the alleged exclusive dealing agreement than before its inception; that plaintiff may not isolate its Ward account from its other bedding operations and predicate recovery solely upon financial data related to the Ward account alone; that plaintiff must predicate recovery upon loss of net, rather than gross, profits; and that plaintiff may recover in no event if the Ward business resulted in net losses. Thus further inquiry is necessary to determine whether the net losses of plaintiff stem from its bedding operations or other sources, and whether plaintiff enjoyed net profits on its Ward business and on its bedding business as a whole. There is a limitation on plaintiff's damages that the record requires be imposed. Since it appears without dispute that Ward purchased private-label bedding from manufacturers other than Sealy beginning in August, 1963, thus abandoning any exclusive dealing agreement that may have been in existence, the period for which plaintiff may seek damages is limited to the two years from August, 1961 to August, 1963.

### III. *The Section 3 Allegation.*

On summary judgment, the inferences that may be drawn from the demonstrated facts must be viewed most favorably to the party moved against, here the plaintiff. United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1964); Technograph Printed Circuits Ltd. v. Methode Electric, Inc.,

356 F.2d 442 (7th Cir. 1966). And where conflicting inferences may be drawn, summary judgment is inappropriate. Crown Cork & Seal Co., Inc. v. Hires Bottling Company of Chicago, 7th Cir., 371 F.2d 256. Opinion filed January 11, 1967. While the Court recognizes that Rule 56 insists that the party moved against do more than merely rely on its allegations and come forth with factual evidence, see United States v. Mt. Vernon Mill Co., 345 F.2d 404 (7th Cir. 1965) and Beaufort Concrete Co. v. Atlantic States Construction Co., 352 F.2d 460 (5th Cir. 1966), the Court is also aware that summary judgment should be granted sparingly in antitrust cases, Levin v. Joint Commission on Accreditation of Hospitals, 122 U.S.App.D.C. 383, 354 F.2d 515 (1966), especially where motive and intent are important factors to be considered. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1961); Crest Auto Supplies, Inc. v. Ero Mfg. Co., 360 F.2d 896 (7th Cir. 1966). The principles of these cases dictate that plaintiff is entitled to go to the jury on the sole issue of whether there was an exclusive dealing agreement in existence among defendants, even though plaintiff must rely in the main on the hope that the jury will choose to disbelieve all of defendants' witnesses who will assert that plaintiff was terminated not pursuant to an exclusive dealing agreement but as the result of a unilateral decision by Ward to select a national source of supply for its private-label bedding in the hope of achieving uniform quality control. A genuine issue of credibility which must be submitted to the trier of fact is present here, especially where the witnesses are interested in the outcome of the litigation. Poller v. Columbia Broadcasting System, Inc., supra; Susman v. South Texas Package Stores Association, 33 F.R.D. 340 (S.D.Texas 1963); Colby v. Klune, 178 F.2d 872 (2nd Cir. 1949). Plaintiff's case, however, is buttressed by the fact that Ward purchased no private-label bedding from any manufacturer other than Sealy, Inc. from August, 1961,

to August, 1963. The Court has assessed the admissibility of evidence for the purposes of this motion, as it may do, Gauck v. Meleski, 346 F.2d 433 (5th Cir. 1965), and even though plaintiff's president cannot testify at trial to the existence of the industry rumor to the effect that Ward and Sealy were locked in an exclusive dealing agreement because of the hearsay rule, nevertheless the interest of defendants' witnesses in the outcome of the litigation and the issue of their credibility constitute sufficient reasons to submit the question of the existence of an exclusive dealing agreement to the jury. This is the only genuine issue of fact raised by the record.

 Before that may be allowed to occur, however, plaintiff must make some showing that the alleged exclusive dealing agreement, if found to exist, is unlawful. An exclusive dealing agreement is not unlawful *per se;* it is unlawful only if a court finds that its performance foreclosed, or will probably foreclose, competition in a substantial share of the line of commerce affected. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). At this point in the litigation, plaintiff has adduced little to indicate the probable anticompetitive effects of the alleged exclusive dealing agreement in the appropriate product line in the relevant market area. This is clearly its burden, and unless it is met, the Court cannot give appropriate scrutiny to the economic ramifications, including the possible justifications, of the alleged exclusive dealing agreement. Susser v. Carvel Corp., 332 F.2d 505 (2d Cir. 1965). The primary concern of the antitrust laws is with the character of competition in the line of commerce in the relevant market and not with the fate of a particular competitor. Unless an exclusive dealing agreement has the requisite deleterious effects on competition by substantially lessening competition in a significant share of the market, the law affords no redress for any one competitor who may have been uniquely injured by it.

 The relevant competitive market area is the controlling factor in an exclusive dealing case. Tampa Electric Co. v. Nashville Coal Co., supra, 365 U.S. at 329, 81 S.Ct. 623, 5 L.Ed.2d 580. While it is clear that here the line of commerce involved is private-label cotton innerspring and matching box spring bedding, and that the share of the market foreclosed is that percentage of the market represented by Ward purchases, the relevant geographic market area is not susceptible of easy definition. The relevant market area, however, must be that in which plaintiff effectively competed for the business of retailers of bedding under private labels. Tampa Electric Co. v. Nashville Coal Co., supra. Whether the share of that market represented by Ward and allegedly foreclosed by the exclusive dealing agreement is substantial is a question of law that remains to be determined by the Court before trial. If it is, its foreclosure to manufacturers of bedding other than participants in the Sealy national accounts program will have the requisite deleterious effect on competition required by Section 3 to condemn the alleged exclusive dealing agreement.

IV. *The Section 1 and 2 Allegations.*

 The Court is of the opinion that the record presents no material questions of fact with regard to whether defendants have violated Section 2 of the Sherman Act, and that plaintiff has shown nothing upon which to base a recovery under Section 2, thus failing to sustain its burden under Rule 56. For these reasons, the Court is of the opinion that defendants are entitled to summary judgment insofar as plaintiff seeks to base its recovery upon a violation of Section 2. Bond Distributing Co. v. Carling Brewery Co., 32 F.R.D. 409 (D.Md.) aff'd 325 F.2d 158 (4th Cir. 1963); Crawford Transport Co. v. Chrysler, 338 F.2d 934 (6th Cir. 1964).

 The Court finds it unnecessary to consider at this time whether the conduct of the defendants violates Section 1. If defendants' conduct does not fall with-

in the ban of Section 3 of the Clayton Act, it follows that it is not proscribed by Section 1. Tampa Electric Co. v. Nashville Coal Co., supra, 365 U.S. at 335, 81 S.Ct. 623, 5 L.Ed.2d 580.

For the reasons stated above, the defendants' motion for summary judgment is sustained in part and denied in part.

Order accordingly.