FONTANA AVIATION, INC., a Michigan Corporation, Plaintiff,

v.

Robert BALDINELLI et al., Defendants.

No. M–51–73 CA.

United States District Court, W. D. Michigan, W. D.

July 20, 1976.

Francis J. McConnell, Chicago, Ill., for plaintiff.

Eugene Driker, Detroit, Mich., John L. Mouw, Iron Mountain, Mich., W. Gerald Warren, Detroit, Mich., for defendants.

## OPINION ON MOTIONS FOR SUMMARY JUDGMENT

MILES, District Judge.

This is an antitrust case alleging a conspiracy to monopolize the business of renting automobiles in the Iron Mountain, Michigan area. Plaintiff is located at the Ford Airport in Iron Mountain and is engaged primarily in the sales, service and repair of aircraft. Defendants are major rent-a-car corporations and their local licensees.

According to plaintiff, in 1961, defendants Avis and Hertz concluded exclusive license agreements with defendants Baldinelli and Anderson Motors, respectively.

At this time, and throughout the development of this case, Fontana leased to Dickenson County the terminal building it had built at Ford Airport. Under that lease agreement, Fontana had exclusive right to all concessions in the public lobby of the terminal. Apparently desirous of entering into the local airport rent-a-car market, both the licensees entered into oral arrangements with Fontana whereby Fontana would handle all rentals originating at Ford Airport in exchange for a 20% share of the income from those rentals. Half of this amount represented rental of space in the terminal, and the other half was in payment for services rendered by Fontana in preparing and processing the rental agreements and caring for rental cars. Under these arrangements, Hertz and Avis were granted space in the terminal for signs and counters, and Fontana would actually handle the car rental transaction. These agreements were also consummated in 1961.

Subsequently, defendant Baldinelli began what plaintiff believes to be a concerted effort to create in himself a monopoly in the rent-a-car business in the area. Plaintiff alleges that in 1969, Baldinelli entered into an agreement with defendant Lundholm in which Lundholm was to act as a "front" for Baldinelli and seek the Hertz license for the area. This was accomplished, and according to plaintiff, Baldinelli had then an effective monopoly.

On or before May 5, 1969, Baldinelli allegedly removed all the Avis and Hertz equipment and signs from behind the counters of the terminal building. During that same period, Baldinelli ran newspaper advertisements proclaiming that the relationship with Fontana had been terminated and that future rentals would be handled from Baldinelli's office. Fontana then demanded audits from both rent-a-car companies and was met during July, 1969, with letters stating in part that their relationship had been terminated and closing their accounts with Fontana. The instant suit was filed July 2, 1973, and seeks treble damages in the amount of $300,000, along with an in-

junction enjoining the defendants from further "conspiratorial activities."

Defendants have moved for summary judgment, their primary argument being that this action is barred by the statute of limitations contained in 4B of the Clayton Act, 15 U.S.C., § 15b, which provides:

"Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued. * * *"

The initial question thus becomes when this cause of action accrued. Standards for this determination have been laid down by the Supreme Court in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971):

"The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action accrued,' 15 U.S.C. § 15b, plus any additional number of years during which the statute of limitations was tolled. Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. See, *e. g., Suckow Borax Mines Consolidated, Inc. v. Borax Consolidated, Ltd.*, 185 F.2d 196, 208 (CA 9 1950); *Bluefields S. S. Co. v. United Fruit Co.*, 243 F. 1, 20 (CA 3 1917), appeal dismissed, 248 U.S. 595, 39 S.Ct. 136, 63 L.Ed. 438 (1919); *2361 State Corp. v. Sealy, Inc.*, 263 F.Supp. 845, 850 (N.D.Ill.1967). This much is plain from the treble-damage statute itself. 15 U.S.C. § 15." 401 U.S. at 338, 91 S.Ct. at 806.

To similar effect in this Circuit is *Akron Presform Mold Co. v. McNeil Corp.*, 496 F.2d 230 (6th Cir. 1974):

"This statute of limitations commences to run from the commission of the last overt act causing injury or damage. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Garelick v. Goerlich's Inc.*, 323 F.2d 854, 855 (6th Cir. 1963)." 496 F.2d at 233.

Under this rule, defendants argue that plaintiff was injured, and thus the statute began to run on the date the defendants "pulled out." If this be the case, the suit is barred since the "pullout" occurred over four years from commencement of this suit. Plaintiff, on the other hand, argues that because of the way defendants "pulled out" and their actions immediately subsequent thereto, Fontana was not injured until formal notice of the termination was given through the July, 1969 letters. Alternatively, plaintiff argues that the statute has been tolled since it comes within an exception to the general rule, which delays the running of the statute when a "continuing conspiracy" is involved.

Each side makes reference to deposition evidence which is said to favor its interpretation of the events leading to the termination of this business relationship. Defendants point to the deposition of Mark Fontana, one of the officers of the plaintiff, arguing that he there admitted that injury was sustained as of the May "pullout."

"Q  I take it, then, the point of pull-out is when they stopped paying and that is when you first sustained your damages, and you will measure from that point on?

"A  Well, I—I'm not sure how the damage measure will be built. Our attorney has a lot to do with that. I can tell you when we were hurt.

"Q  When?

"A  And that is from the time that they stopped paying to date.

"Q  Okay. And the time you stopped writing the contracts for your commission or concession?

"A  If they are—I think they are coincident.

"Q  The same time?

"A  Right.

"Q  The May 3rd date?

"A  Right." (PP. 89–90.)

Defendants find a similar admission in the deposition of the following colloquy from Joseph Fontana, Sr., plaintiff's president:

"Q (By Mr. McIntyre, continuing): Based upon your own personal knowledge, when was Fontana Aviation, Inc., when did it first receive an injury as a result of the alleged conduct of Baldinelli and Lundholm?

"A Well, immediately they quit paying us commissions, so it's still going on, every day now. Tomorrow it's going to be more.

"Q And they stopped paying commissions as of—what did you say, Mr. McConnell? April 30, you agreed to that, '69?

"MR. MC CONNELL: Right. We have been damaged from May 1 on, okay? Does that help you?

"MR. MC INTYRE: Yeah.

"MR. MC CONNELL: And we are still being damaged.

"THE WITNESS: Still doing it now. Still doing it now.

"MR. MC CONNELL: And we have still got a continuing conspiracy, which you are a party to; okay?

"MR. MC INTYRE: Okay. So, if I understand you, May 1 you first sustained damage, and can we use that as the termination date?

"MR. MC CONNELL: No, I don't know that that was the termination date, until they advised us in July we didn't know what their position was as far as paying concession fees. We knew that they weren't using our services.

"Q (By Mr. McIntyre, continuing): You knew as of that date, one, they had removed their signs?

"A Yes."

Plaintiff finds support for its views in this same colloquy, while at the same time stressing other deposition testimony which is said to cast light on the details of the "pullout" and Fontana's reactions to it:

"Q And Baldinelli took his out on May 3rd; right?

"A As far as I know, Baldinelli picked them all up and didn't tell me. Just told the office girl.

"Q That was on May 3rd; wasn't it?

"A About that time.

"Q And Lundholm left a few days after Baldinelli, according to your pleadings; isn't that right?

"A They left exactly at the same time, as far as I know." Joseph Fontana, Sr. Deposition, p. 35.

"Q Okay. But the time when Red Baldinelli, Mr. Baldinelli, Defendant in this lawsuit terminated his relationship with you, went out and got his rental forms, went out and got his Hertz charge plate thing, that was May 3rd; right?

"A That's all he did, though. He didn't tell me he was terminating.

"Q That was May 3rd; was it not?

"A He didn't tell me nothing at that time.

"Q When did he first tell you he was terminating?

"A He never did tell me." *Id.* at 39.

"Q When he came out and took those two things and his signs on May 3rd, did he lodge any complaints with you?

"A He didn't talk to me at all.

"Q Did he talk to anyone else out there; if you know?

"A Well, as far as I know he just told my office girl he was taking those out, that she wouldn't have to make out any more rental agreements.

"Q Okay. Who was that office girl?

"A I don't recall.

"Q You don't recall her name?

"A No. Which one it was, no." *Id.* at 110–111.

"Q (By Mr. McIntyre, continuing): Now, after that time, what I am driving at is, you said they continued to write agreements out there; right?

"A Um-hmm.

"Q And what, who was doing that?

"A Well, Baldinelli and Leonard Reed.

"Q Okay. And where were they doing it?

"A On the—sometimes on the window sill, sometimes on the counter, you know, or that little office that's there, sometimes on North Central's counter. Different places in the Terminal Building." *Id.* at 176.

"Q And you realized that, as soon as they both left on May 3rd?

"A No. I didn't realize that until we got a response to our demand for an audit, and that occurred July the 26th, I think.

"Q Why did that revelation come to you at that time, rather than at the time they both departed?

"A Well, as far as we were concerned, since they were still conducting their business at the airport and out of the Terminal Building, that we had right to those concessions on that strength of our terminal lease with the County and so, like I said, we took a wait-see position at that point, to see what was going to happen, and when nothing did, they ignored us completely and when that became obvious that they weren't going to come out for an audit, talk or anything else, then we sent the letter demanding an audit." Mark Fontana Deposition, p. 150.

Under the case law already cited, the question of the accrual of this action is resolved by determining when "the last overt act causing injury or damage" occurred. This has been held to mean at that point in time when "the blow which caused the damage was struck." *Zenith, supra; Baldwin v. Loew's, Inc.*, 312 F.2d 387 (7th Cir. 1963); *Steiner v. 20th Century Fox Film Corp.*, 232 F.2d 190, 194–195 (9th Cir. 1956). Also, it is clear that the period of limitation is not extended merely because damages from the injury may be continuing. *Saunders v. National Basketball Assoc.*, 348 F.Supp. 649 (N.D.Ill.1972).

Subsumed in this inquiry is, of course, the issue of whether or not these facts can be said to give rise to a "continuing" conspiracy. In this regard, the *Zenith* case again sets the standard:

"In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. See, *e. g., Crummer Co. v. Du Pont*, 223 F.2d 238, 247–248 (CA 5 1955); *Delta Theaters, Inc. v. Paramount Pictures, Inc.*, 158 F.Supp. 644, 648 (E.D.La.1958); *Momand v. Universal Film Exchange, Inc.*, 43 F.Supp. 996, 1006 (Mass.1942), aff'd, 172 F.2d, at 49. However, each separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial. See, *e. g., Farbenfabriken Bayer, A. G. v. Sterling Drug, Inc.*, 153 F.Supp. 589, 593 (D.C. N.J.1957); *Momand v. Universal Film Exchange, Inc., supra*, 43 F.Supp. at 1006. Cf. *Lawlor v. Loewe*, 235 U.S. 522, 536, 35 S.Ct. 170, 172, 59 L.Ed. 341 (1915). Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action. On the other hand, it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable. *Moe Light, Inc. v. Foreman*, 238 F.2d 817, 818 (CA 6 1956); *Chicago & N. W. R. Co. v. De Clow*, 124 F. 142, 143 (CA 8 1903); *Culley v. Pennsylvania R. Co.*,

244 F.Supp. 710, 715 (D.C.Del.1965). Cf. *Howard v. Stillwell & Bierce Mfg. Co.*, 139 U.S. 199, 206, 11 S.Ct. 500, 503, 35 L.Ed. 147 (1891)." 401 U.S. at 338–339, 91 S.Ct. at 806.

In *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), the Fifth Circuit dealt with allegations of a continuing antitrust conspiracy. In the process of remanding the case, the Court set forth a number of criteria indicative of continuing conspiracy:

"Where the violation is final at its impact, for example, where the plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitations period and upon the initial act.

" * * *

" '[W]e are not dealing with an act which occurs within some specific and limited time span. . . . Rather, we are dealing with conduct which constituted a continuing violation.' *See also Baker v. F. & F. Investment*, 7 Cir. 1970, 420 F.2d 1191, 1200; *Highland Supply Corp. v. Reynolds Metals Co.*, 8 Cir. 1964, 327 F.2d 725, 732; *Susser v. Carvel Corp.*, S.D.N.Y. 1962, 206 F.Supp. 636, 651–52, aff'd, 2 Cir. 1964, 332 F.2d 505, cert. dismissed, 1965, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284.

" * * * It remains clear nonetheless that a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action.

" * * * As the foregoing discussion makes clear, we think it critical that the court determine whether there was, during the period sued upon, a mere absence of dealing, or whether there was some specific act or word precluding Poster from obtaining supplies from National Screen." 517 F.2d at 126–128.

When the instant case is viewed in this light, it cannot be concluded that a "continuing conspiracy" is involved. Rather, it is apparent that the Court is confronted with a "violation final at its impact," "an actionable wrong * * * by its nature permanent at initiation without further acts * * *" which occurred "within some specific and limited time span."

In *Poster Exchange* the Court found that the plaintiff had been actively excluded for a sustained period of time from any participation in the industry it sought to enter. There is no evidence of that type of conduct here. There is nothing to indicate that Fontana could not have endeavored to secure an exclusive rent-a-car license arrangement for itself had it chosen to do so. Fontana's case is much closer to the so-called antitrust "termination" cases. An example is *Emich Motor Corp. v. General Motors Corp.*, 229 F.2d 714 (7th Cir. 1956). There, Emich had a formal dealer contractual relationship with General Motors which General Motors terminated. The Seventh Circuit upheld the trial court's dismissal of the action and its finding that the statute began running at the date of cancellation.

Furthermore, the instant situation is distinguishable from cases in which continuing conspiracies have been found. In *Pioneer Co., Inc. v. Talon, Inc.*, 462 F.2d 1106 (8th Cir. 1972), after distinguishing the *Emich* case, the Court stated:

"Pioneer, on the contrary, suffered a continuing conspiracy to prevent it from wholesaling Talon zippers at discount prices; it subsequently placed orders which were refused because of the continuing conspiracy. It had no contract, as did Emich, and there was nothing to cancel—only orders to refuse which Talon and Donahue did refuse on September 4th. It is, therefore, clear that even though Donahue gave notice, it terminated nothing of legal significance. See *2361 State Corporation v. Sealy Inc.*, 263 F.Supp. 845, 851 (N.D.Ill.1967). Subsequent orders placed in due course were rejected because of the continuing conspiracy and specific damage resulted.

"This is not a case where a single act causes damages that are suffered over a long period of time. Here, to maintain their manufacturers' price, Talon and Donahue were obliged to continue their violation of the antitrust laws by refusing to sell to Pioneer on its request. Since the record shows continued refusals until at least September 4, 1964, the action is not barred." 462 F.2d at 1108.

█ Thus, the question of "when the blow was struck" must be viewed in terms of discreet, ascertainable acts and events rather than, in the words of *Poster Exchange*, a "continually accruing cause of action." When the evidence here is analyzed with the legal principles enunciated earlier, the Court must conclude that the "blow was struck" when the relationship between the parties was actually terminated, that is, at the time of the "pullout" during May, rather than when the formal written notice of that fact was made in July. The "pullout" was the specific act which gave rise to the damages which Fontana argues continue to this day; that later incidents are but its consequences. The deposition evidence reads that plaintiff knew, and was on notice, of the "pullout" that the previously-agreed upon relationship between the parties was no longer what it was. Moreover, within ten days of the "pullout", Avis published a "Public Notice" in the local newspaper stating: "Therefore, AVIS * * * has decided to terminate its operations from the Ford Airport terminal building * * * Avis rental notifies all of its customers to come to its downtown office." This should have left no doubt in plaintiff's mind that its relationship was in fact severed.

█ Moreover, since the plaintiff does not contend that the defendants attempted to fraudulently conceal the termination, the case law is clear that plaintiff's purported indecision and/or apparent ignorance of its rights is insufficient to withstand a statute of limitations defense or to toll its operation. *Akron Presform Mold Co., supra; Laundry Equipment Sales Co. v. Borg-Warner Co.*, 334 F.2d 788, 792 (7th Cir. 1964).

Nor do we find merit in plaintiff's contention that the statute is tolled because the future damages attributable to defendants' actions are "speculative."

"It should be noted that the *Zenith* case does not require that the plaintiff have the best evidence possible of his damage, but rather only that the damages be provable. This court is aware that in some cases, and perhaps this is one, damages are better proven at a later time. However, that does not mean at an earlier point in time, enough evidence of damage was not available to allow the issue to go to a jury. When there is enough evidence to allow the issue to go to a jury the damages are no longer speculative, notwithstanding that at a later time better evidence of damage might become available. 'The *moment* the victim can prove * * * damages, the statute begins to run leaving four more years * * to assert them.' *Poster Exchange, Inc. v. National Screen Service Corp.*, 456 F.2d 662, 667 (5th Cir. 1972) [Emphasis added]." *Monona Shores, Inc. v. U. S. Steel Corp.*, 374 F.Supp. 930, 936 (D.Minn.1973).

This rationale is fully applicable here. The evidence reveals that there has been a nine-year course of dealing between the parties. This is clearly sufficient to allow the issue of damages to go to the jury.

In view of the fact that it is determined that there is not a continuous conspiracy here, and because the operative event which gave rise to the injuries alleged herein took place beyond the limitations period, it is concluded that plaintiff's action is barred by the statute of limitations embodied in the Clayton Act. Accordingly, defendants' motions for summary judgment are GRANTED.

IT IS SO ORDERED.